**In re KINGSPORT VENTURES, L.P. d/b/a Kingsport Comfort Inn, Debtor.**

No. 00–31734.

United States Bankruptcy Court, E.D. Tennessee.

July 19, 2000.

Gentry, Tipton, Kizer & McLemore, P.C., Maurice K. Guinn, Knoxville, TN, for Kingsport Ventures, L.P.

Williams and Prochaska, P.C., Harris P. Quinn, Memphis, TN, for The Chase Manhattan Bank.

Ellen B. Vergos, United States Trustee, Region 8, Patricia C. Foster, Knoxville, TN, for the United States Trustee.

### MEMORANDUM ON MOTION FOR AUTHORITY TO USE CASH COLLATERAL AND MOTION TO TERMINATE AUTOMATIC STAY

RICHARD S. STAIR, Jr., Chief Judge.

This matter is before the court on two motions. First is the Motion for Authority to Use Cash Collateral and for Preliminary Hearing (Motion to Use Cash Collateral) filed by the Debtor, Kingsport Ventures, L.P., on April 28, 2000. The Chase Manhattan Bank, as Trustee for the registered holders of Credit Suisse First Boston Mortgage Securities Corp., Commercial Mortgage–Pass Through Certificates, Series 1997–C1 (Bank), filed an Objection to Debtor's Motion for Authority to Use Cash Collateral on May 2, 2000. On May 4, 2000, May 18, 2000, and June 13, 2000, agreed orders were entered authorizing the Debtor's use of cash collateral pending a final hearing on the matter subject to specified conditions.[1] Also before the court is the Motion to Terminate Automatic Stay, or, in the Alternative, for Adequate Protection (Motion to Terminate Automatic Stay) filed by the Bank on May 2, 2000. The parties filed Stipulations of Facts and Exhibits in Connection with Bank's Motion to Terminate Automatic Stay or, in the Alternative, for Adequate Protection and Debtor's Motion to Use Cash Collateral on June 16, 2000. Both motions were consolidated for hearing and a bench trial was held on June 23, 2000. On June 30, 2000, a fourth agreed order was entered in order to authorize the Debtor to use the cash collateral pending the court's decision on the two motions.

This is a core proceeding. 28 U.S.C.A. § 157(b)(2)(G), (M) (West 1993).

### I

The Debtor is a limited partnership which owns and operates the Kingsport Comfort Inn in Kingsport, Tennessee. The Debtor's principal asset is the commercial real estate upon which it operates the motel. It funds the operation of the Kingsport Comfort Inn with the revenues generated by the motel.

On May 15, 1997, the Debtor executed a Promissory Note in the principal amount of $3,750,000.00 in favor of Belgravia Capital Corporation. The Promissory Note was secured by personal and real property, including the motel revenues and the

1. All three agreed orders recite that the "Bank does not waive any claims or defenses in opposition to Debtor's use of cash collateral including, but not limited to, the Bank's assertion that it owns the subject cash collateral or that [it] already has a post-petition security interest in the cash collateral by virtue of 11 U.S.C. § 552(b)(2)."

commercial real estate, pursuant to a Deed of Trust, Assignment of Leases and Rents and Security Agreement (Deed of Trust) executed by the Debtor on the same date. Also on May 15, 1997, the Debtor executed an Assignment of Leases and Rents (Assignment) to Belgravia Capital Corporation which has been recorded in the Register's Office of Sullivan County, Tennessee. The Deed of Trust and Assignment are now owned and held by the Bank.

The Assignment provides in material part:

1. ***Present Assignment.*** Assignor does hereby absolutely and unconditionally assign to Assignee all of Assignor's right, title, and interest in and to all current and future Leases and Rents, it being intended by Assignor that this assignment constitutes a present, absolute and unconditional assignment and not an assignment for additional security only. Such assignment to Assignee shall not be construed to bind Assignee to the performance of any covenants, conditions, or provisions contained in any such Lease or otherwise to impose any obligation upon Assignee.... Nevertheless, subject to the terms of this paragraph, Assignee grants to Assignor a revocable license to operate and manage the Property and to collect the Rents. Assignor shall hold the Rents, or a portion thereof, sufficient to discharge all current sums due on the Debt for use in the payment of such sums. Upon an Event of Default (as defined in the Security Instrument), the license granted to Assignor herein shall automatically be revoked by Assignee and Assignee shall immediately be entitled to receive and apply all Rents, whether or not Assignee enters upon and takes control of the Property. [Assignee is] [and Trustee (as defined in the Security Instrument) are] hereby granted and assigned by the Assignor the right, at its option, upon the revocation of the license granted herein to enter upon the Property in person, by agent or by court-appointed receiver to collect the Rents. Any Rents collected after the revocation of the license herein granted may be applied toward payment of the Debt in such priority and proportion as Assignee, in its discretion, shall deem proper.

2. ***Remedies of Assignee.*** Upon or at any time after an Event of Default, Assignee may, at its option, without waiving such Event of Default, without notice and without regard to the adequacy of the security for the Debt, either in person or by agent, with or without bringing any action or proceeding, or by a receiver appointed by a court, take possession of the Property and have, hold, manage, lease and operate the Property on such terms and for such period of time as Assignee may deem proper and either with or without taking possession of the Property in its own name, demand, sue or otherwise collect and receive all Rents....

....

14. ***Governing Law.*** This Assignment shall be governed and construed in accordance with the laws of the State in which the real property encumbered by the Security Instrument is located.

15. ***Termination of Assignment.*** Upon payment in full of the Debt and the delivery and recording of a satisfaction, release, and reconveyance or discharge of the Security Instrument duly executed by Assignee, this Assignment shall become and be void and of no effect.

Under the Promissory Note, the Debtor was obligated to make a payment of interest only on June 1, 1997, followed by monthly payments of principal and interest in the amount of $33,496.45 beginning July 1, 1997. Prior to its bankruptcy, the Debtor was in default under the Promissory Note for failure to make the payments due on and after January 1, 2000. In addition, the Debtor was in default under a term of the Deed of Trust which required it to pay certain costs, fees, and charges, including a monthly payment to the Bank equal to

one-twelfth of the insurance and taxes due on the commercial real estate.

In February 2000, the Bank, through Edward C. Brown, Asset Manager for Lennar Partners, Inc., the Special Servicer for the Bank's loan, notified the Debtor by certified mail that the Debtor was "in default under the Note and other Loan Documents by virtue of, among other things, its failure to pay amounts due thereunder." Mr. Brown informed the Debtor that the Bank would take action to protect its interests, including foreclosure, if it did not receive "all amounts due under the Loan within (10) days of receipt of [the] letter." The Debtor did not pay the amounts due and the Bank accelerated the debt and scheduled a foreclosure sale of the property for April 28, 2000, at noon. On the morning of April 28, 2000, the Debtor filed its voluntary Chapter 11 petition and the. Bank cancelled the sale. As of that date, the Debtor owed the Bank the principal balance of $3,665,544.68. · The parties stipulate that the indebtedness owed by the Debtor to the Bank is a non-recourse debt and exceeds the value of the property.

At trial, the court heard the testimony of Derek Eisele who testified about, among other things, the Debtor's intention in executing the Assignment. Mr. Eisele testified that the Debtor did not intend to effect a transfer of its ownership interests when it executed the Assignment. Rather, he testified, the Debtor intended only to create a security agreement.[2] Mr. Eisele also testified that the limited partners were willing to supply funds necessary to make adequate protection payments to the Bank if the court finds that such payments are required. He testified that in the event that the limited partners refused to supply the funding, the general partner could provide it. There was no testimony or other evidence as to any specific limited partner that is willing to supply funding for adequate protection payments or as to any specific amount available from any source.

## II

The Debtor requests authorization to use cash collateral pursuant to 11 U.S.C.A. § 363(c)(2) which provides:

> The trustee may not use, sell, or lease cash collateral under paragraph (1) of this subsection unless—
>
>> (A) each entity that has an interest in such cash collateral consents; or
>>
>> (B) the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section.

11 U.S.C.A. § 363(c)(2) (West 1993).[3] "Cash collateral" is defined in § 363(a) as follows:

> "[C]ash collateral" means cash, negotiable instruments, documents of title, securities, deposit accounts, or other cash equivalents whenever acquired in which the estate and an entity other than the estate have an interest and includes the proceeds, products, offspring, rents, or profits of property and the fees, charges, accounts or other payments for the use or occupancy of room and other public facilities in hotels, motels, or other lodging properties subject to a security interest as provided in section 552(b) of this title, whether existing before or after the commencement of a case under this title.

*Id.* at (a) (West Supp.2000).

 Property cannot be cash collateral unless it is also property of the estate

---

2. Although Mr. Eisele testified as the representative of the Debtor, he is not an employee nor did he sign the Assignment on the Debtor's behalf. The Assignment was executed by Dennis S. Frank, the owner and President of DSF Kingsport Corporation. DSF Kingsport Corporation is the sole general partner of Kingsport Partners, L.P., which is the Debtor's sole general partner.

3. The ability to use cash collateral under § 363(c)(2) extends to the Debtor by virtue of 11 U.S.C.A. § 1107(a) which endows a Chapter 11 debtor in possession with "virtually all of the rights and powers of a bankruptcy trustee...." *United States v. Hunter (In re Walter),* 45 F.3d 1023, 1027 (6th Cir.1995).

because, under § 363(c)(2), cash collateral includes only property "in which *the estate* and an entity other than the estate have an interest...." *Id.* (emphasis added). Thus, property that is not property of the estate as defined in 11 U.S.C.A. § 541(a) (West 1993) is "not available as cash collateral nor as a funding source for the debtor's reorganization plan." *First Fidelity Bank, N.A. v. Jason Realty, L.P. (In re Jason Realty, L.P.),* 59 F.3d 423, 425–26 (3rd Cir.1995) (determining whether rents are property of the estate under § 541(a) when considering debtor's motion to use the rents as cash collateral); *see also In re Suter,* 181 B.R. 116, 119 (Bankr.N.D.Ala. 1994). Property of the estate includes "all legal or equitable interests of the debtor in property as of the commencement of the case" and "[p]roceeds, product, offspring, rents, or profits of or from property of the estate...." 11 U.S.C.A. § 541(a)(1), (6).

In addition to the Debtor's request for authorization to use cash collateral, the court has before it the Bank's request for relief from the automatic stay with regard to the property and the motel revenues. The commencement of a debtor's case gives rise to the automatic stay which protects the debtor, its property, and property of the estate from numerous actions set forth in 11 U.S.C.A. § 362(a) (West 1993 & Supp.2000). A party in interest may pursue actions prohibited by § 362(a) only after obtaining relief from the stay under 11 U.S.C.A. § 362(d) which provides in material part:

> On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay—
>
> (1) for cause, including the lack of adequate protection of an interest in property of such party in interest;

(2) with respect to a stay of an act against property under subsection (a) of this section, if—

> (A) the debtor does not have an equity in such property; and
>
> (B) such property is not necessary to an effective reorganization[.]

11 U.S.C.A. § 362(d) (West 1993 & Supp. 2000).[4]

The court will first determine whether the Debtor or the estate has an interest in the motel revenues in order to determine the applicability of § 362(a) and § 363(c)(2).

### III

It is undisputed that the Debtor assigned its interest in the motel revenues to the Bank under the May 15, 1997 Assignment; that the Assignment grants the Debtor a license to collect and use the revenues until its default under the terms of its obligations to the Bank; and that the Debtor defaulted prior to commencing its bankruptcy case. The court must now determine the effect of the Assignment.

 By its terms, the Assignment is governed by Tennessee law, as Tennessee is the state in which the motel property is located. Tennessee courts have recognized that a grant of a security interest in property and an absolute assignment of property are two distinct and allowable methods for creating credit against which a party may borrow funds. *See American Trust & Banking Co. v. Twinam,* 187 Tenn. 570, 216 S.W.2d 314, 319 (1948); *Nashville Trust Co. v. First Nat'l Bank,* 123 Tenn. 617, 134 S.W. 311, 314 (1911); *see also In re BVT Chestnut Hill Apartments, Ltd.,* 115 B.R. 116, 117 (Bankr. M.D.Tenn.1990); *In re Harbour Town Assocs., Ltd.,* 99 B.R. 823, 824 (Bankr. M.D.Tenn.1989).[5] "Under Tennessee law

**4.** Although the parties stipulate that the property is single asset real estate and therefore is subject to 11 U.S.C.A. § 362(d)(3) (West Supp.2000), the Bank did not request relief

pursuant to that provision because the required 90–day period had not yet expired.

**5.** As to issues regarding the perfection of the interests created by an assignment of rents,

an assignment of rents is presumed to be a pledge of rents as security." *Harbour Town Assocs., Ltd.,* 99 B.R. at 824; *see also BVT Chestnut Hill Apartments, Ltd.,* 115 B.R. at 117. The presumption is not conclusive and may be rebutted with evidence that the assignment of rents was an absolute assignment rather than a pledge of security. *See BVT Chestnut Hill Apartments, Ltd.,* 115 B.R. at 117 (analyzing the provisions of the assignment at issue to determine whether the presumption had been overcome); *Harbour Town Assocs., Ltd.,* 99 B.R. at 824 (recognizing both absolute assignments of rents and assignments for security when applying Tennessee law).[6]

The Fifth Circuit has recognized that, in the interest of public policy, "courts are reluctant to construe an assignment of rents clause as absolute." *Federal Deposit Ins. Corp.,* 929 F.2d at 1036. This is because, it explained, "an absolute assignment generally does not effect the intent of the parties." *Id.* at 1038. The court admonished, however, that "[p]ublic policy does not require us to ignore the clear and unambiguous intent of the parties as expressed in their agreement." *Id.*

 To determine whether an assignment of rents is an absolute assignment or a pledge of security, a court must analyze the language and provisions of the assignment. *See BVT Chestnut Hill Apartments, Ltd.,* 115 B.R. at 117; *Harbour Town Assocs., Ltd.,* 99 B.R. at 825. Statements within the assignment that the assignment was intended to secure a debt is strong evidence that the assignments are in fact a pledge of security, even if the assignment is referred to as "absolute."

*See BVT Chestnut Hill Apartments, Ltd.,* 115 B.R. at 117 (finding that an assignment of rents was actually a pledge of security where, among other facts, the assignment was described as being both absolute and a pledge of security); *Harbour Town Assocs., Ltd.,* 99 B.R. at 825 (finding that an assignment of rents was actually a pledge of security where, among other facts, the assignment stated that its purpose was the provision of security).

 The court is also guided by general principles of Tennessee contract law in its analysis of the Assignment. "The cardinal rule for interpretation of contracts is to ascertain the intention of the parties from the contract as a whole and to give effect to that intention consistent with legal principles." *Gray v. Estate of Gray,* 993 S.W.2d 59, 64 (Tenn.Ct.App.1998), *permission to appeal denied,* (Tenn.1999); *Union Planters Nat'l·Bank v. American Home Assurance Co.,* 865 S.W.2d 907, 912 (Tenn.Ct.App.1993). In doing so, the court "does not attempt to ascertain the parties' state of mind at the time the contract was executed, but rather their intentions as actually embodied and expressed in the contract as written." *Union Planters Nat'l Bank,* 865 S.W.2d at 912. The words used in the contract are "given their usual, natural and ordinary meaning." *Id.; see also Gray,* 993 S.W.2d at 64. Finally, a contract must be enforced as it is written, even where its terms seem harsh or unjust, unless there is proof of fraud or mistake. *See Gray,* 993 S.W.2d at 64.

 Upon review of the Assignment executed by the Debtor, the court concludes that the Assignment is an absolute

---

*Harbour Town Associates, Ltd.,* has been superceded by TENN.CODE ANN. § 66–26–116 (1993), as recognized by the court in *Wilhite Pure Oil Truck Stop, Inc. v. McCutchen (In re McCutchen),* 115 B.R. 126 (Bankr.W.D.Tenn. 1990). Perfection of the Bank's interest is not at issue here.

**6.** In this context, the distinction between an absolute assignment of rents and the creation of a security interest in rents has been charac-

terized as a legal fiction. *See Federal Deposit Ins. Corp. v. International Property Management, Inc.,* 929 F.2d 1033, 1035 (5th Cir. 1991). The distinction, however, is recognized by Tennessee and other states, including Texas, California and New Jersey. *See id.* (discussing Texas and California law); *Jason Realty, L.P.,* 59 F.3d at 427 (citing New Jersey law).

assignment and not a pledge of security. First, the language of the Assignment is clear and unambiguous in its statement that it was "intended by Assignor that this assignment constitutes a present, absolute and unconditional assignment and not an assignment for additional security only." Second, the Assignment provides that the Debtor retained nothing more than a revocable license to operate the motel property and collect the rents. Third, the Assignment does not require the Assignee to take any action in order to collect the rents after an event of default. Specifically, it provides that the Debtor's license to collect the rents "shall automatically be revoked" after an event of default and that the Assignee may take control and possession of the property and the rents "with or without bringing any action or proceeding." Fourth, the Assignment gives the Assignee total discretion regarding the application of rents collected by it after default to reduce the Debtor's outstanding obligation. It provides in permissive rather than mandatory terms that the rents "may be applied toward payment of the Debt in such priority or proportion as Assignee, in its discretion, shall deem proper." *See Federal Deposit Ins. Corp.*, 929 F.2d at 1038 (finding that an assignment of rents was an absolute assignment where its provisions were similar to those at issue here).

Although Mr. Eisele testified that the Debtor intended to grant only a security interest in the Assignment, that testimony does not change the result. The court must enforce the Assignment as it is written, thus it must look to the intent as it is embodied in the contract rather than the state of mind of the party executing the contract.[7] *See Union Planters Nat'l Bank*, 865 S.W.2d at 912. The intent embodied in the Assignment is the intent to create an absolute and unconditional assignment and not merely a security interest.

## IV

The court must now determine the effect of the absolute assignment. In *Nashville Trust Co.*, the Supreme Court of Tennessee determined that a decedent, who had assigned a life insurance policy in order to create credit against which to borrow, had executed an absolute assignment rather than a pledge of security. *See Nashville Trust Co.*, 134 S.W. at 314. The court then turned to the effect of the absolute assignment:

> The fact was that it was absolutely assigned, leaving no vestige of legal right to it or the proceeds of it in the decedent. So it was, from the date of the assignment, during his life and at his death. The interest he had in it from the time of the assignment, during his life and at his death, was an equity, pure and simple, and not a legal right. With this equitable interest as his basis of credit, he contracted the debts shown by the record. If he, during life, had sought to recover the policy, and to cancel his absolute assignment of it without paying these debts, he would have been repelled by a court of equity on the ground that he who would have equity must do equity.

*Id.;* see also *American Trust & Banking Co.*, 216 S.W.2d at 319 (quoting *Nashville Trust Co.*).

Thus, an absolute assignment divests the assignor of any legal right in the subject property as of the date of the assignment and vests those rights in the assignee.[8] *See Nashville Trust Co.*, 134 S.W. at 314; *American Trust & Banking Co.*, 216 S.W.2d at 319. Further, any equitable right that the assignor may have in the property is subordinate to the rights of

---

7. *See supra* note 2.

8. Absolute assignments operate similarly in states other than Tennessee. *See, e.g., Jason Realty, L.P.*, 59 F.3d at 427 (applying New Jersey law); *Federal Deposit Ins. Corp.*, 929 F.2d at 1035 (citing Texas and California law).

the assignee. *See Nashville Trust Co.*, 134 S.W. at 314; *American Trust & Banking Co.*, 216 S.W.2d at 319. Accordingly, the assignor cannot assert those rights against the assignee and cannot reclaim the subject property based on any such equitable right as long as the related debt is outstanding. *See Nashville Trust Co.*, 134 S.W. at 314; *American Trust & Banking Co.*, 216 S.W.2d at 319; *see also Harbour Town Assocs., Ltd.*, 99 B.R. at 824 ("An absolute assignment of rents would not be a pledge and would be superior to the mortgagor and third party creditors.").

■ In the present matter, the Debtor transferred its legal title in the motel revenues to the Assignee when it executed the Assignment long before it filed its bankruptcy petition. From that date forward it had no legal right to that property. Any equitable right that it may have in the property is subordinate to and cannot be asserted against the Bank until its debt to the Bank is satisfied. It is undisputed that the Debtor's obligation to the Bank cannot be satisfied by the property securing that debt. As a result, the Debtor has no equitable right to those revenues. Accordingly, the court concludes that the motel revenues are not property of the estate and the court may not authorize the Debtor to use the revenues as cash collateral. Further, the protection of the automatic stay does not extend to those motel revenues because they are not property of the estate or property of the Debtor.

## V

■ The Bank also asks for relief from the automatic stay with regard to the motel property. It is entitled to relief under § 362(d)(2) if the Debtor has no equity in the property and if the property is not necessary for an effective reorganization. *See* 11 U.S.C.A. § 362(d)(2). The first requirement under § 362(d)(2) is satisfied because it is undisputed that the Debtor has no equity in the property. The second requirement is also satisfied in light of the court's determination that the Debtor may not use the motel revenues to fund its operations. Those revenues have been the Debtor's only source of funds for operating the motel and it cannot operate without them. The Debtor will not be able to reorganize.[9]

## VI

In summary, the Debtor's prepetition Assignment of its motel revenues was an absolute assignment. The effect of that Assignment was to divest the Debtor of its legal rights in the property and to prevent it from asserting any remaining equitable rights in the property against the Assignee as long as the related debt remains outstanding. As a result, the motel revenues are the Bank's property and not property of the Debtor or property of the estate. As such, they may not be used as cash collateral and are not protected by the automatic stay. The Bank is entitled to receive those revenues. Without those revenues, the Debtor will not be able to reorganize. Thus, the Bank is also entitled to relief from the automatic stay regarding the motel property, because the Debtor has no equity in the property and it will not be able to reorganize. The Debtor's Motion for Authority to Use Cash Collateral will be denied and the Bank's

---

9. The Third Circuit has acknowledged that decisions like the one here "may create serious obstacles for debtors whose sole income stream is rents" but stressed that bankruptcy courts must interpret assignments as courts would interpret them outside of bankruptcy. *See Jason Realty, L.P.*, 59 F.3d at 429 (citing *William E. Butner v. United States et al.*, 440 U.S. 48, 54–56, 99 S.Ct. 914, 918, 59 L.Ed.2d 136). It explained that this situation creates a tension between "a bankruptcy court's objective [which] is to preserve, if possible, an ongoing business" and presents courts with "[t]he perennial problem facing bankruptcy judges [which] is to strike a proper balance between rights of the creditor and debtor." *Id.* Taking that into consideration, the court concluded that "the otherwise worthy desire for achieving a reorganization under Chapter 11 should not trump the rights of an assignee of a lease under a prepetition assignment." *Id.* at 430.

Motion to Terminate Automatic Stay, or, in the Alternative, for Adequate Protection will be granted.

**SO ORDERED.**