In re NextWAVE PERSONAL
COMMUNICATIONS, INC.,
et al., Debtors.

Bankruptcy No. 98 B 21529(ASH).

United States Bankruptcy Court,
S.D. New York.

June 16, 1999.

Andrews & Kurth L.L.P., by Deborah L. Schrier–Rape, Gregory Bevel, Dallas, TX, for debtors.

Mary Jo White, United States Attorney for the Southern District of New York by Daniel S. Alter, New York City, for defendant.

*DECISION DENYING MOTION TO LIFT THE AUTOMATIC STAY*

ADLAI S. HARDIN, Jr., Bankruptcy Judge.

Following this Court's decision dated May 12, 1999 (the "May 12 Decision") sustaining the constructive fraudulent conveyance claim of debtor NextWave Personal Communications, Inc. ("NPCI"), the Federal Communications Commission ("FCC") has moved to lift the automatic stay under 11 U.S.C. § 362(d)(1) for "cause." The alleged "cause" is that, by reason of the May 12 Decision, NPCI will not be paying the full amounts of its winning bids in the C block auction for 63 spectrum licenses awarded to it by the FCC.

For the reasons stated below, the motion is denied.[1]

In addition to the May 12 Decision, of particular relevance to this motion is this Court's Revised Decision on Motion to Dismiss dated December 7, 1998 (the "December 7 Decision"), which granted in part and denied in part the FCC's motion to dismiss for lack of subject matter jurisdiction NPCI's adversary proceeding against the FCC. To avoid unnecessary repetition in this decision, familiarity with the December 7 Decision and the May 12 Decision is assumed.

NPCI's winning bids for the 63 spectrum licenses in the C block auction and reauction ending May and July 1996 totaled $4.7 billion, an average of $1.53 per MHz/Pop. The C block licenses were not awarded to NPCI until January 1997. The FCC's auction of D, E and F block licenses commenced in September 1996 and concluded in mid-January 1997. The average price bid per MHz/Pop for D, E and F block licenses was $0.33. The prices bid in the D/E/F block auction and other factors [2] undermined the public per-

---

1. The Court has jurisdiction of the debtor's Chapter 11 case and this contested matter by reason of 28 U.S.C. §§ 1334(a) and 157(a) and the standing order of reference dated July 10, 1984 signed by Acting Chief Judge Robert J. Ward. This is a core proceeding under 11 U.S.C. § 157(b)(2).

2. *See* May 12 Decision at footnote 11.

ception of the value of the C block licenses and made it impossible for the winning C block licensees to raise any money in the public market necessary to build out their wireless systems as required under the FCC license regulations. *See* 47 C.F.R. § 24.203.

NPCI filed its Chapter 11 petition on June 8, 1998 and, the same day, filed its adversary proceeding against the FCC seeking, *inter alia*, to declare voidable its $4.7 billion bid obligation as a constructive fraudulent conveyance under 11 U.S.C. § 544. In the May 12 Decision this Court sustained the constructive fraudulent conveyance claim based upon findings that the total value received by NPCI in exchange for its payment obligation to the FCC was $1.023 billion. As a consequence of the May 12 Decision and the Court's Decision on Remedy, the NPCI's payment obligation to the FCC will be reduced from $4.7 billion to $1.023 billion.

The FCC's motion to lift the automatic stay is based upon (i) the fact that NPCI will not be paying the full $4.7 billion that it bid for its 63 C block licenses and (ii) the FCC's own regulations.

The FCC's regulations conditioned the grant of C block licenses upon the licensee's "full and timely payment of the winning bid." 47 C.F.R. § 24.708(a); *see also* 47 C.F.R. § 1.2109(a) (1996) (same). In circumstances where the regulations permit certain designated entities such as NPCI to pay the full amount of their high bids in installments over the term of their licenses, 47 C.F.R. § 1.2110(e) (1996), a license "granted to an eligible entity that elects installment payments shall be conditioned upon the full and timely performance of the licensee's payment obligations under the installment plan." 47 C.F.R. § 1.2110(e)(4) (1996). In the event of default by the licensee, "the license will automatically cancel and the Commission will initiate debt collection procedures." 47 C.F.R. § 1.2110(e)(4)(iii) (1996).

Asserting that the requirement that a licensee pay its winning bids in full "is the keystone of the FCC's spectrum auction program" (FCC Memo at 2),[3] the FCC argues in substance that the provision in the regulations for automatic cancellation of NPCI's licenses upon default in NPCI's payment obligation constitutes "cause" under Section 362(b)(1) of the Bankruptcy Code for relief from the automatic stay to permit the FCC, in effect, to reclaim the "cancelled" licenses and otherwise pursue its remedy under its regulations.

■ The issue thus raised is closely related to the issues raised in the FCC's initial motion to dismiss for lack of subject matter jurisdiction. For this reason. the analysis in the December 7 Decision largely disposes of the FCC's contentions on this motion. To summarize that Decision, Section 309(j) of the Federal Communications Act ("FCA") provides the statutory authority for the FCC's spectrum auction program, including the authorization to grant special financing incentives to designated entities through deferred payment in installments. In so doing, Congress authorized the FCC not only to act in its capacity as a regulator of spectrum licenses, but also to become a creditor of licensees qualifying as designated entities. However, nothing in Section 309(j) or elsewhere in the FCA granted the FCC, acting in its capacity as a creditor, any rights, privileges or obligations superior to or different from the rights, privileges and obligations of other creditors. More specifically, nothing in the FCA or elsewhere granted the FCC acting as a creditor any exemption from the provisions of the Bankruptcy Code, and Congress has declined to grant any such exemption despite the FCC's attempts to lobby for such an exemption.

---

**3.** This assertion may be viewed with some skepticism in view of the FCC's oft-repeated acknowledgement that revenue generation for the Federal government is *not* the primary objective of Section 309(j) of the FCA and the FCC's auction regulations.

■ With this perspective, the FCC's contentions on this motion may be easily resolved. Like any other creditor, the FCC is subject to the avoidance powers provided in Sections 544 and 548 of the Bankruptcy Code. As would be the case with any other creditor in similar circumstances, for the reasons set forth in the May 12 Decision NPCI's aggregate bid obligation to the FCC of $4.7 billion was subject to avoidance to the extent of $3.7 billion. As a consequence, NPCI's "payment obligations" to the FCC *have been reduced* from $4.7 billion to $1.023 billion, of which some $473 million has already been paid. The balance will have to be paid by NPCI under the installment plan authorized by Congress and implemented by the FCC regulations. Of course, if NPCI were to default in the future in its payment obligation on the balance, its spectrum licenses would then be subject to automatic cancellation under 47 C.F.R. § 1.2110(e)(4)(iii). But for the present NPCI is not in default. Unless and until NPCI defaults in "the full and timely performance of [its] licensee's payment obligations under the installment plan," there is no default and, therefore, no "cause" to lift the automatic stay under 11 U.S.C. § 362(d)(1).

The FCC argues that its regulations condition grant of the licenses upon "full and timely payment of the *winning bid amount*" (emphasis supplied), citing to the language in Section 24.708(a) of 47 C.F.R. NPCI retorts that the automatic cancellation provision in Section 1.2110(e)(4)(iii) refers to default in the "fall and timely performance of the licensee's *payment obligations*" (emphasis supplied). But the difference in wording between "winning bid amount" and "payment obligations" is immaterial. Whatever the verbiage, the substance of the matter is that the FCC's right to payment as a creditor is subject to avoidance under the relevant Bankruptcy Code provisions just like the right to payment of any other creditor.

■ Nor is it material that the FCC has provided in its regulation that the grant of the licenses is conditioned upon full payment of either the licensee's "winning bid amount" or "payment obligations," or that the regulations provide for automatic cancellation of the licenses upon default. Aside from the fact that there has been no default by NPCI, the FCC's own regulations are entitled to no more nor less weight in the context of bankruptcy proceedings than the contractual notes, mortgages and similar documents required by other creditors in commercial transactions. Creditors' rights under their contracting documents are frequently subject to modification under provisions of the Bankruptcy Code such as the avoidance powers in Sections 544 and 548. Stated simply, the FCC's regulations, to the extent that they establish and govern the rights and obligations of the FCC and the licensee *in their capacities as creditor and debtor*, are subject to modification under the Bankruptcy Code, just like the contractual rights and obligations of an ordinary creditor vis a vis its debtor. As stated in the December 7 Decision:

> The basic defect in the FCC's argument is that Congress did not confer upon the FCC the power to determine unilaterally its own rights as a creditor in competition with and to the detriment of other creditors.... Nothing in Section 3090 or elsewhere in the FCA even suggests that Congress intended to empower the FCC to promulgate orders [or regulations] which have nothing to do with its regulatory functions and which are designed solely to enhance the FCC's position as a creditor to the detriment of rights provided under the Bankruptcy Code for the benefit of other creditors and the debtor.

The cases relied upon by the FCC do not support its position. For the contention that "[t]hese regulatory conditions upon the Licenses remain fully enforceable by the FCC even though NextWave is in bankruptcy" (FCC Memo at 2) the FCC

cites *In re Farmers Markets, Inc.*, 792 F.2d 1400, 1403 (9th Cir.1986), where the Ninth Circuit said "the estate takes the license subject to the restrictions imposed on the debtor by its transferor." To the same effect the FCC cites *In re Bay Ridge Inn*, 94 F.2d 555 (2d Cir.1938). As pointed out in NPCI's opposing memorandum, both *Farmers Markets* and *Bay Ridge* concern sale or transfer of liquor licenses from one party to another, with direct implication of the governmental regulatory power. Similarly, the case of *In re Gull Air, Inc.*, 890 F.2d 1255 (1st Cir.1989). concerns the FAA's power under regulations respecting the use of airport slots not being used by the debtor airline and having nothing to do with any debtor-creditor relationship. By contrast, the regulations relied upon by the FCC in this case are concerned solely with the debtor-creditor relationship between the parties and do not implicate the FCC's regulatory jurisdiction.

To summarize, the FCC is subject to the provisions of the Bankruptcy Code in its capacity as a creditor. NPCI's payment obligations to the FCC in respect of its winning bids on C block licenses have been modified in accordance with the avoidance provisions of Section 544 of the Bankruptcy Code. The modification of the FCC's rights as a creditor in accordance with the Bankruptcy Code does not constitute a default by NPCI, and NPCI is not in default in respect of its modified payment obligations. Accordingly, there is no "cause" to lift the automatic stay under Section 362(d)(1), and the FCC's motion must be denied.