# FEDERAL COMMUNICATIONS COMMISSION *v.* NEXTWAVE PERSONAL COMMUNICATIONS INC. ET AL.

No. 01–653.   Argued October 8, 2002—Decided January 27, 2003*

---

*Together with No. 01–657, *Arctic Slope Regional Corp. et al. v. Next-Wave Personal Communications Inc. et al.,* also on certiorari to the same court.

SCALIA, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and O'CONNOR, KENNEDY, SOUTER, THOMAS, and GINSBURG, JJ., joined, and in which STEVENS, J., joined as to Parts I and II. STEVENS, J., filed an opinion concurring in part and concurring in the judgment, *post*, p. 308. BREYER, J., filed a dissenting opinion, *post*, p. 310.

*Acting Solicitor General Clement* argued the cause for petitioner Federal Communications Commission in No. 01–653. With him on the briefs were *Deputy Solicitor General Wallace, Jeffrey A. Lamken, William Kanter, Jacob M. Lewis, John A. Rogovin, Daniel M. Armstrong,* and *Joel Marcus. Jonathan S. Franklin* argued the cause for petitioners Arctic Slope Regional Corp. et al. in No. 01–657. With him on the briefs was *Lorane F. Hebert.*

*Donald B. Verrilli, Jr.,* argued the cause for respondents in both cases. With him on the briefs were *Ian Heath Gershengorn, William M. Hohengarten, Thomas G. Hungar, Douglas R. Cox, Miguel A. Estrada, G. Eric Brunstad, Jr.,* and *Deborah L. Schrier-Rape.*

*Laurence H. Tribe* argued the cause and filed a brief for Creditors NextWave Communications, Inc., as *amici curiae* urging affirmance. With him on the brief were *Charles Fried* and *Elizabeth Warren.*†

JUSTICE SCALIA delivered the opinion of the Court.

In these cases, we decide whether § 525 of the Bankruptcy Code, 11 U. S. C. § 525, prohibits the Federal Communications Commission (FCC or Commission) from revoking licenses held by a debtor in bankruptcy upon the debtor's failure to make timely payments owed to the Commission for purchase of the licenses.

---

†Briefs of *amici curiae* urging affirmance were filed for Airadigm Communications, Inc., by *Richard P. Bress* and *James F. Rogers;* for Urban Comm-North Carolina, Inc., et al. by *Charles J. Cooper, David H. Thompson, Preben Jensen,* and *Charles E. Simpson;* for Professor Kathryn R. Heidt, *pro se;* and for Senator Patrick Leahy et al. by *Walter Dellinger* and *Jonathan D. Hacker.*

## I

In 1993, Congress amended the Communications Act of 1934 to authorize the FCC to award spectrum licenses "through a system of competitive bidding." 48 Stat. 1085, as amended, 107 Stat. 387, 47 U. S. C. § 309(j)(1). It directed the Commission to "promot[e] economic opportunity and competition" and "avoi[d] excessive concentration of licenses" by "disseminating licenses among a wide variety of applications, including small businesses [and] rural telephone companies." § 309(j)(3)(B). In order to achieve this goal, Congress directed the FCC to "consider alternative payment schedules and methods of calculation, including lump sums or guaranteed installment payments . . . or other schedules or methods . . . ." § 309(j)(4)(A).

The FCC decided to award licenses for broadband personal communications services through simultaneous, multiple-round auctions. *In re Implementation of Section 309(j) of the Communications Act—Competitive Bidding*, 9 FCC Rcd. 2348, ¶¶ 54, 68 (1994). In accordance with §§ 309(j)(3)(B) and (4)(A), it restricted participation in two of the six auction blocks (Blocks "C" and "F") to small businesses and other designated entities with total assets and revenues below certain levels, and it allowed the successful bidders in these two blocks to pay in installments over the term of the license. 47 CFR § 24.709(a)(1) (1997).

Respondents NextWave Personal Communications, Inc., and NextWave Power Partners, Inc. (both wholly owned subsidiaries of NextWave Telecom, Inc., and hereinafter jointly referred to as respondent NextWave), participated, respectively, in the FCC's "C-Block" and "F-Block" auctions. NextWave was awarded 63 C-Block licenses on winning bids totaling approximately $4.74 billion, and 27 F-Block licenses on winning bids of approximately $123 million. In accordance with FCC regulations, NextWave made a downpayment on the purchase price, signed promissory notes for the balance, and executed security agreements that the FCC per-

fected by filing under the Uniform Commercial Code. The security agreements gave the Commission a first "lien on and continuing security interest in all of the Debtor's rights and interest in [each] License." Security Agreement between NextWave and FCC ¶ 1 (Jan. 3, 1997), 2 App. to Pet. for Cert. 402a. In addition, the licenses recited that they were "conditioned upon the full and timely payment of all monies due pursuant to . . . the terms of the Commission's installment plan as set forth in the Note and Security Agreement executed by the licensee," and that "[f]ailure to comply with this condition will result in the automatic cancellation of this authorization." Radio Station Authorization for Broadband PCS (issued to NextWave Jan. 3, 1997), 2 App. to Pet. for Cert. 388a.

After the C-Block and F-Block licenses were awarded, several successful bidders, including NextWave, experienced difficulty obtaining financing for their operations and petitioned the Commission to restructure their installment-payment obligations. See 12 FCC Rcd. 16436, ¶ 11 (1997). The Commission suspended the installment payments, 12 FCC Rcd. 17325 (1997); 13 FCC Rcd. 1286 (1997), and adopted several options that allowed C-Block licensees to surrender some or all of their licenses for full or partial forgiveness of their outstanding debt. See 12 FCC Rcd. 16436, ¶ 6; 13 FCC Rcd. 8345 (1998). It set a deadline of June 8, 1998, for licensees to elect a restructuring option, and of October 29, 1998, as the last date to resume installment payments. 13 FCC Rcd. 7413 (1998).

On June 8, 1998, after failing to obtain stays of the election deadline from the Commission or the Court of Appeals for the District of Columbia Circuit, NextWave filed for Chapter 11 bankruptcy protection in New York. See *In re NextWave Personal Communications, Inc.*, 235 B. R. 263, 267 (Bkrtcy. Ct. SDNY 1998). It suspended payments to all creditors, including the FCC, pending confirmation of a reorganization plan. NextWave initiated an adversary proceed-

ing in the Bankruptcy Court, alleging that its $4.74 billion indebtedness on the C-Block licenses was avoidable as a "fraudulent conveyance" under § 544 of the Bankruptcy Code, 11 U. S. C. § 544, because, by the time the Commission actually conveyed the licenses, their value had declined from approximately $4.74 billion to less than $1 billion. The Bankruptcy Court agreed [1]—ruling in effect that the company could keep its C-Block licenses for the reduced price of $1.02 billion—and the District Court affirmed. *NextWave Personal Communications, Inc.* v. *FCC*, 241 B. R. 311, 318–319 (SDNY 1999). The Court of Appeals for the Second Circuit reversed, holding that, although the Bankruptcy Court might have jurisdiction over NextWave's underlying debts to the FCC, it could not change the conditions attached to NextWave's licenses. *In re NextWave Personal Communications, Inc.*, 200 F. 3d 43, 55–56 (1999) *(per curiam)*. The Second Circuit also held that since, under FCC regulations, "NextWave's obligation attached upon the close of the auction," there had been no fraudulent conveyance by the FCC acting in its capacity as creditor. *Id.*, at 58.

Following the Second Circuit's decision, NextWave prepared a plan of reorganization that envisioned payment of a single lump sum to satisfy the entire remaining $4.3 billion obligation for purchase of the C-Block licenses, including interest and late fees. The FCC objected to the plan, asserting that NextWave's licenses had been canceled automatically when the company missed its first payment deadline in October 1998. The Commission simultaneously announced that NextWave's licenses were "available for auction under the automatic cancellation provisions" of the FCC's regulations. *Public Notice, Auction of C and F Block Broadband PCS Licenses*, 15 FCC Rcd. 693 (2000). NextWave sought

---

[1] We do not reach the merits of the determination that the licenses should be valued as of the time they were conveyed, rather than as of the time NextWave won the auction entitling it to conveyance.

emergency relief in the Bankruptcy Court, which declared the FCC's cancellation of respondent's licenses "null and void" as a violation of various provisions of the Bankruptcy Code. *In re NextWave Personal Communications, Inc.,* 244 B. R. 253, 257–258 (Bkrtcy. Ct. SDNY 2000). Once again, the Court of Appeals for the Second Circuit reversed. *In re Federal Communications Commission,* 217 F. 3d 125 (2000). Granting the FCC's petition for a writ of mandamus, the Second Circuit held that "[e]xclusive jurisdiction to review the FCC's regulatory action lies in the courts of appeals" under 47 U. S. C. § 402, and that since the reauction decision was regulatory, proclaiming it to be arbitrary was "outside the jurisdiction of the bankruptcy court." 217 F. 3d, at 139, 136. The Second Circuit noted, however, that "NextWave remains free to pursue its challenge to the FCC's regulatory acts." *Id.,* at 140.

NextWave filed a petition with the FCC seeking reconsideration of the license cancellation, denial of which is the gravamen of the cases at bar. *In the Matter of Public Notice DA 00–49 Auction of C and F Block Broadband PCS Licenses, Order on Reconsideration,* 15 FCC Rcd. 17500 (2000). NextWave appealed that denial to the Court of Appeals for the D. C. Circuit pursuant to 47 U. S. C. § 402(b), asserting that the cancellation was arbitrary and capricious, and contrary to law, in violation of the Administrative Procedure Act, 5 U. S. C. § 706, and the Bankruptcy Code. The Court of Appeals agreed, holding that the FCC's cancellation of NextWave's licenses violated 11 U. S. C. § 525: "Applying the fundamental principle that federal agencies must obey all federal laws, not just those they administer, we conclude that the Commission violated the provision of the Bankruptcy Code that prohibits governmental entities from revoking debtors' licenses solely for failure to pay debts dischargeable in bankruptcy." 254 F. 3d 130, 133 (2001). We granted certiorari. 535 U. S. 904 (2002).

## II

The Administrative Procedure Act requires federal courts to set aside federal agency action that is "not in accordance with law," 5 U. S. C. § 706(2)(A)—which means, of course, *any* law, and not merely those laws that the agency itself is charged with administering. See, *e. g., Citizens to Preserve Overton Park, Inc.* v. *Volpe,* 401 U. S. 402, 413–414 (1971) ("In all cases agency action must be set aside if the action was 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law' or if the action failed to meet statutory, procedural, or constitutional requirements"). Respondent contends, and the Court of Appeals for the D. C. Circuit held, that the FCC's revocation of its licenses was not in accordance with § 525 of the Bankruptcy Code.

Section 525(a) provides, in relevant part:

> "[A] governmental unit may not . . . revoke . . . a license . . . to . . . a person that is . . . a debtor under this title . . . solely because such . . . debtor . . . has not paid a debt that is dischargeable in the case under this title . . . ."[2]

---

[2] The full text of 11 U. S. C. § 525(a) reads as follows:

"Except as provided in the Perishable Agricultural Commodities Act, 1930, the Packers and Stockyards Act, 1921, and section 1 of the Act entitled 'An Act making appropriations for the Department of Agriculture for the fiscal year ending June 30, 1944, and for other purposes,' approved July 12, 1943, a governmental unit may not deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, discriminate with respect to such a grant against, deny employment to, terminate the employment of, or discriminate with respect to employment against, a person that is or has been a debtor under this title or a bankrupt or a debtor under the Bankruptcy Act, or another person with whom such bankrupt or debtor has been associated, solely because such bankrupt or debtor is or has been a debtor under this title or a bankrupt or debtor under the Bankruptcy Act, has been insolvent before the commencement of the case under this title, or during the case but before the debtor is granted or denied a discharge, or has not paid a debt that is dischargeable in the case under this title or that was discharged under the Bankruptcy Act."

No one disputes that the Commission is a "governmental unit" that has "revoke[d]" a "license," nor that NextWave is a "debtor" under the Bankruptcy Act. Petitioners argue, however, that the FCC did not revoke respondent's licenses "solely because" of nonpayment, and that, in any event, NextWave's obligations are not "dischargeable" "debt[s]" within the meaning of the Bankruptcy Code. They also argue that a contrary interpretation would unnecessarily bring § 525 into conflict with the Communications Act. We find none of these contentions persuasive, and discuss them in turn.

## A

The FCC has not denied that the proximate cause for its cancellation of the licenses was NextWave's failure to make the payments that were due. It contends, however, that § 525 does not apply because the FCC had a "valid regulatory motive" for the cancellation. Brief for Petitioners Arctic Slope Regional Corp. et al. 19; see Brief for Petitioner FCC 17. In our view, that factor is irrelevant. When the statute refers to failure to pay a debt as the sole cause of cancellation ("solely because"), it cannot reasonably be understood to include, among the other causes whose presence can preclude application of the prohibition, the governmental unit's *motive* in effecting the cancellation. Such a reading would deprive § 525 of all force. It is hard to imagine a situation in which a governmental unit would not have some further motive behind the cancellation—assuring the financial solvency of the licensed entity, *e. g., Perez* v. *Campbell,* 402 U. S. 637 (1971); *In re The Bible Speaks,* 69 B. R. 368, 374 (Bkrtcy. Ct. Mass. 1987), or punishing lawlessness, *e. g., In re Adams,* 106 B. R. 811, 827 (Bkrtcy. Ct. NJ 1989); *In re Colon,* 102 B. R. 421, 428 (Bkrtcy. Ct. ED Pa. 1989), or even (quite simply) making itself financially whole. Section 525 means nothing more or less than that the failure to pay a dischargeable debt must alone be the proximate cause of the cancellation—the act or event that triggers the agency's decision to cancel,

whatever the agency's ultimate motive in pulling the trigger may be.

Some may think (and the opponents of § 525 undoubtedly thought) that there *ought* to be an exception for cancellations that have a valid regulatory purpose. Besides the fact that such an exception would consume the rule, it flies in the face of the fact that, where Congress has intended to provide regulatory exceptions to provisions of the Bankruptcy Code, it has done so clearly and expressly, rather than by a device so subtle as denominating a motive a cause. There are, for example, regulatory exemptions from the Bankruptcy Code's automatic stay provisions. 11 U. S. C. § 362(b)(4). And even § 525(a) itself contains explicit exemptions for certain Agriculture Department programs, see n. 2, *supra*. These latter exceptions would be entirely superfluous if we were to read § 525 as the Commission proposes—which means, of course, that such a reading must be rejected. See *United States* v. *Nordic Village, Inc.,* 503 U. S. 30, 35–36 (1992).

## B

Petitioners contend that NextWave's license obligations to the Commission are not "debt[s] that [are] dischargeable" in bankruptcy. 11 U. S. C. § 525(a). First, the FCC argues that "regulatory conditions like the full and timely payment condition are not properly classified as 'debts'" under the Bankruptcy Code. Brief for Petitioner FCC 33. In its view, the "financial nature of a condition" on a license "does not convert that condition into a debt." *Ibid.* This is nothing more than a retooling of petitioners' recurrent theme that "regulatory conditions" should be exempt from § 525. No matter how the Commission casts it, the argument loses. Under the Bankruptcy Code, "debt" means "liability on a claim," 11 U. S. C. § 101(12), and "claim," in turn, includes any "right to payment," § 101(5)(A). We have said that "[c]laim" has "the broadest available definition," *Johnson* v. *Home State Bank,* 501 U. S. 78, 83 (1991), and have held that the

"plain meaning of a 'right to payment' is nothing more nor less than an enforceable obligation, regardless of the objectives the State seeks to serve in imposing the obligation," *Pennsylvania Dept. of Public Welfare* v. *Davenport,* 495 U. S. 552, 559 (1990). See also *Ohio* v. *Kovacs,* 469 U. S. 274 (1985). In short, a debt is a debt, even when the obligation to pay it is also a regulatory condition.

Petitioners argue that respondent's obligations are not "dischargeable" in bankruptcy because it is beyond the jurisdictional authority of bankruptcy courts to alter or modify regulatory obligations. Brief for Petitioners Arctic Slope Regional Corp. et al. 28–29; Brief for Petitioner FCC 30–31. Dischargeability, however, is not tied to the existence of such authority. A preconfirmation debt is dischargeable unless it falls within an express exception to discharge. Subsection 1141(d) of the Bankruptcy Code states that, except as otherwise provided therein, the "confirmation of a plan [of reorganization] . . . discharges the debtor from *any debt* that arose before the date of such confirmation," 11 U. S. C. § 1141(d)(1)(A) (emphasis added), and the only debts it excepts from that prescription are those described in § 523, see § 1141(d)(2). Thus, "[e]xcept for the nine kinds of debts saved from discharge by 11 U. S. C. § 523(a), a discharge in bankruptcy discharges the debtor *from all debts that arose before bankruptcy.* § 727(b)." *Kovacs, supra,* at 278 (emphasis added).

Artistically symmetrical with petitioners' contention that the Bankruptcy Court has no power to alter regulatory obligations is their contention that the D. C. Circuit has no power to modify or discharge a debt. See Brief for Petitioner FCC 31–32; Brief for Petitioner Arctic Slope Regional Corp. et al. 32, n. 9. Just as the former is irrelevant to whether the Bankruptcy Court can discharge a debt, so also the latter is irrelevant to whether the D. C. Circuit can set aside agency action that violates § 525. That court did not seek to modify or discharge the debt, but merely prevented the FCC from

violating § 525 by canceling licenses because of failure to pay debts dischargeable by bankruptcy courts.

## C

Finally, our interpretation of § 525 does not create any conflict with the Communications Act. It does not, as petitioners contend, obstruct the functioning of the auction provisions of 47 U. S. C. § 309(j), since nothing in those provisions demands that cancellation be the sanction for failure to make agreed-upon periodic payments. Indeed, nothing in those provisions even requires the Commission to permit payment to be made over time, rather than leaving it to impecunious bidders to finance the full purchase price with private lenders. What petitioners describe as a conflict boils down to nothing more than a policy preference on the FCC's part for (1) selling licenses on credit and (2) canceling licenses rather than asserting security interests in licenses when there is a default. Such administrative preferences cannot be the basis for denying respondent rights provided by the plain terms of a law. " '[W]hen two statutes are capable of coexistence, it is the duty of the courts, absent a clearly expressed congressional intention to the contrary, to regard each as effective.'" *J. E. M. Ag Supply, Inc.* v. *Pioneer Hi-Bred International, Inc.*, 534 U. S. 124, 143–144 (2001) (quoting *Morton* v. *Mancari*, 417 U. S. 535, 551 (1974)). There being no inherent conflict between § 525 and the Communications Act, "we can plainly regard each statute as effective." *J. E. M., supra*, at 144. And since § 525 circumscribes the Commission's permissible action, the revocation of Next-Wave's licenses is not in accordance with law. See 5 U. S. C. § 706.

## III*

The dissent finds it "dangerous . . . to rely exclusively upon the literal meaning of a statute's words," *post*, at 311 (opinion

---

*JUSTICE STEVENS does not join this Part.

of BREYER, J.). Instead, it determines, in splendid isolation from that language,[3] the *purpose* of the statute, which it takes to be "to forbid discrimination against those who are, or were, in bankruptcy and, more generally, to prohibit governmental action that would undercut the 'fresh start' that is bankruptcy's promise," *post*, at 313. It deduces these language-trumping "purposes" from the most inconclusive of indications. First, the ambiguous title of § 525(a), "Protection against discriminatory treatment," *ibid.* This, of course, could as well refer to discrimination against *impending* bankruptcy, aka insolvency. Second, its perception that the other prohibitions of § 525(a) apply only to acts "done solely for bankruptcy-related reasons." *Ibid.* We do not share that perception. For example, the prohibition immediately preceding the one at issue here forbids adverse government action taken because the debtor "has been insolvent before the commencement of the case under this title, or during the case but before the debtor is granted or denied a discharge." That seems to us clearly tied to insolvency alone (plus the mere fact of subsequent or contemporaneous bankruptcy), and does not require some additional motivation based on bankruptcy. The dissent's third indication of "purpose" consists of the ever-available snippets of legislative history, *post*, at 314–315.

The dissent does eventually get to the statutory text at issue here: Step two of its analysis is to ask what interpretation of that text could possibly fulfill its posited "purposes."[4]

---

[3] The portion of the dissenting opinion that deduces the statute's purposes, Part II, *post*, at 313–315, contains no discussion of the portion of § 525(a) at issue here.

[4] The second of the purposes, by the way—prohibiting government action that "would undercut the 'fresh start' that is bankruptcy's promise," *post*, at 313—plays no real role in the dissent's analysis, if indeed such a circular criterion could ever play a role in any analysis. The whole issue before us can be described as asking what the Bankruptcy Code's promise of a "fresh start" consists of. Rather than reframing the question, our interpretation concretely accords a "fresh start" where the dissent would

"One obvious way," the dissent concludes, "is to interpret the relevant phrase, 'solely because' of nonpayment of 'a debt that is dischargeable,' as requiring something more than a purely factual connection . . . . The statute's words are open to the interpretation that they require a certain relationship between (1) the *dischargeability* of the debt and (2) the decision to revoke the license." *Post*, at 316. To demonstrate that "openness," the dissent gives the example of a "rule telling apartment owners that they cannot refuse to rent 'solely because a family has children who are adopted.'" *Post*, at 319. Such a rule, it says quite correctly, is most reasonably read as making the adoptive nature of the children part of the prohibited motivation. But the example differs radically from the cases before us in two respects: (1) because an adopted child is the exception rather than the rule, and (2) because the class of children other than adopted children is surely not a disfavored one. In the cases before us, by contrast, the descriptive clause describes the rule rather than the exception. (As the dissent acknowledges, "virtually all debts" are dischargeable, *post*, at 310.) And the debts that do not fall within the rule (nondischargeable debts) are clearly disfavored by the Bankruptcy Code. To posit a text similar to the one before us, the dissent should have envisioned a rule that prohibited refusal to rent "solely because a family has children who are no more than normally destructive." Would the "no-more-than-normal-destructiveness" of the children be a necessary part of the apartment owner's motivation before he is in violation of the rule? That is to say, must he refuse to rent specifically *because* the children are no more than normally destructive? Of course not. The provision is most reasonably read as establishing an *exception* to the prohibition, rather than adding a motivation requirement: The owner *may* refuse to rent to families with destructive children. And the same is obvi-

---

not—where there is revocation of a license solely because of a bankrupt's failure to pay dischargeable debts.

ously true here: The government *may* take action that is otherwise forbidden when the debt in question is one of the disfavored class that is nondischargeable.

In addition to distorting the text of the provision, the dissent's interpretation renders the provision superfluous. The purpose of "forbid[ding] discrimination against those who are, or were, in bankruptcy," *post,* at 313, is already explicitly achieved by *another* portion of § 525(a), which prohibits termination of a license "solely because [the] bankrupt or debtor *is or has been . . . a bankrupt or debtor* under the Bankruptcy Act." 11 U. S. C. § 525(a) (emphasis added). The dissent would have us believe that the language "solely because [the] bankrupt or debtor . . . has not paid a debt that is dischargeable" merely achieves the very same objective through inappropriate language. We think Congress meant what it said: The government is not to revoke a bankruptcy debtor's license solely because of a failure to pay his debts.

The dissent makes much of the "serious anomaly" that would arise from permitting "every car salesman, every residential home developer, every appliance company [to] threaten repossession of its product if a buyer does not pay," but denying that power to the government alone, *post,* at 312. It is by no means clear than any anomaly exists. The car salesman, residential home developer, etc., can obtain repossession of his product only (as the dissent acknowledges) "if [he] has taken a security interest in the product," *ibid.* It is neither clear that a private party *can* take and enforce a security interest in an FCC license, see, *e. g., In re Cheskey,* 9 FCC Rcd. 986, ¶ 8 (1994), nor that the FCC *cannot.* (As we described in our statement of facts, the FCC purported to take such a security interest in the present cases. What is at issue, however, is not the enforcement of that interest in the bankruptcy process,[5] but rather elimination of the li-

---

[5] The FCC initially participated in the bankruptcy proceedings as a creditor. See, *e. g., In re NextWave Personal Communications, Inc.,* 235

censes through the regulatory step of "revoking" them—action that the statute specifically forbids.)  In any event, if there is an anomaly it is one that has been created by Congress—a state of affairs the dissent does not think intolerable, since its own disposition creates the anomaly of allowing the government to reclaim its property by means other than the enforcement of a security interest, but not permitting private individuals to do so.

\* \* \*

For the reasons stated, the judgment of the Court of Appeals for the District of Columbia Circuit is

*Affirmed.*

JUSTICE STEVENS, concurring in part and concurring in the judgment.

Because these are such close cases, it seems appropriate to identify the considerations that have persuaded me to join the majority.  When I first read 11 U. S. C. § 525(a), I thought it was not intended to apply to cases in which the licensor was also a creditor, but rather, as JUSTICE BREYER persuasively argues, was merely intended to protect the debtor from discriminatory license terminations.  I remain persuaded that that is the principal purpose of the provision. It is significant, however, that the first words in the section describe three exceptions for statutes, one of which contains language remarkably similar to the language in the security

B. R. 314 (Bkrtcy. Ct. SDNY 1999).  However, after NextWave prepared a plan of reorganization the FCC asserted that the licenses had been automatically canceled and gave notice of its intent to reauction them.  The Second Circuit treated this decision as "regulatory," and thus outside the scope of the Bankruptcy Court's jurisdiction.  See *In re Federal Communications Commission*, 217 F. 3d 125, 139, 136 (2000).  The decision by the D. C. Circuit recognized and seemingly approved that distinction. See 254 F. 3d 130, 143 (2001).

agreements executed by respondents in these cases.[1]  Those exceptions introduce an ambiguity.

On the one hand, they indicate that Congress did not intend § 525(a) to limit the Executive's right to condition the retaining of a federal license on considerations similar to those on which a creditor relies.  The reasons for making an exception for licenses to deal in perishable commodities would seem equally applicable to licenses to exploit the public airwaves.  Indeed, there is probably a greater public interest in allowing prompt cancellation of spectrum licenses than of commodities dealers' licenses because of the importance of facilitating development of the broadcast spectrum.

On the other hand, the exceptions demonstrate that Congress realized the breadth of the language in § 525(a). Rather than make a categorical exception that would have accommodated not only the three cases expressly covered by the text, but also cases like the ones before the Court today, the drafters retained the broad language that the Court finds decisive.  That language endorses a general rule that gives priority to the debtor's interest in preserving control of an important asset of the estate pending the completion of bankruptcy proceedings.

I do not believe that the application of that general rule to these cases will be unfair to the Federal Communications Commission either as a regulator or as a creditor.  If the

---

[1] The Perishable Agricultural Commodities Act, 1930, provides, in part:

"Whenever an applicant has paid the prescribed fee the Secretary . . . shall issue to such applicant a license, which shall entitle the licensee to do business as a commission merchant . . . , but said license *shall automatically terminate . . . unless the licensee . . . pays the applicable renewal fee[:]* [T]he license of any licensee *shall terminate upon said licensee . . . being discharged as a bankrupt,* unless the Secretary finds upon examination of the circumstances of such bankruptcy . . . that such circumstances do not warrant termination."  7 U. S. C. § 499d(a) (emphases added).

The security agreements between NextWave and the Government provided that "the License shall be automatically canceled" upon NextWave's defaulting on an installment payment.  2 App. to Pet. for Cert. 409a.

bankrupt licensee is unable to fulfill other conditions of its license, the regulator may cancel the licenses for reasons that are not covered by § 525(a).[2]  Moreover, given the fact that the Commission has a secured interest in the license, if the licensee can obtain the financing that will enable it to perform its obligations in full, the debt will ultimately be paid. In sum, even though I agree with JUSTICE BREYER's view that the literal text of a statute is not always a sufficient basis for determining the actual intent of Congress, in these cases I believe it does produce the correct answer.

JUSTICE BREYER, dissenting.

The statute before us says that the Government may not revoke a license it has granted to a person who has entered bankruptcy *"solely because [the bankruptcy debtor] . . . has not paid a debt that is dischargeable in [bankruptcy]."*  11 U. S. C. § 525(a) (emphasis added).  The question is whether the italicized words apply when a government creditor, having taken a security interest in a license sold on an installment plan, revokes the license not because the debtor has gone bankrupt, but simply because the debtor has failed to pay an installment as promised.  The majority answers this question in the affirmative.  It says that the italicized words mean

> *"nothing more or less* than that the failure to pay a dischargeable debt must alone be the proximate cause of the cancellation—the act or event that triggers the agency's decision to cancel, whatever the agency's ultimate motive . . . may be." *Ante,* at 301–302 (emphasis added).

Hence, if the debt is a dischargeable debt (as virtually all debts are), then once a debtor enters bankruptcy, the Gov-

---

[2] The Senate Report explained that § 525(a) "does not prohibit consideration of other factors, such as future financial responsibility or ability, and does not prohibit imposition of requirements such as net capital rules, if applied nondiscriminatorily."  S. Rep. No. 95–989, p. 81 (1978).

ernment cannot revoke the license—irrespective of the Government's motive. That, the majority writes, is what the statute says. Just read it. End of the matter.

It is dangerous, however, in any actual case of interpretive difficulty to rely exclusively upon the literal meaning of a statute's words divorced from consideration of the statute's purpose. That is so for a linguistic reason. General terms as used on particular occasions often carry with them implied restrictions as to scope. "Tell all customers that . . ." does not refer to every customer of every business in the world. That is also so for a legal reason. Law as expressed in statutes seeks to regulate human activities in particular ways. Law is tied to life. And a failure to understand how a statutory rule is so tied can undermine the very human activity that the law seeks to benefit. "No vehicles in the park" does not refer to baby strollers or even to tanks used as part of a war memorial. See Fuller, Positivism and Fidelity to Law—A Reply to Professor Hart, 71 Harv. L. Rev. 630, 663 (1958).

I

In my view this statute's language is similarly restricted. A restriction implicitly limits its scope to instances in which a government's license revocation is related to the fact that the debt was dischargeable in bankruptcy. Where the fact of bankruptcy is totally irrelevant, where the government's action has no relation either through purpose or effect to bankruptcy or to dischargeability, where consequently the revocation cannot threaten the bankruptcy-related concerns that underlie the statute, then the revocation falls outside the statute's scope. Congress intended this kind of exception to its general language in order to avoid consequences which, if not "absurd," are at least at odds with the statute's basic objectives. Cf. *United States* v. *Kirby*, 7 Wall. 482, 486 (1869) ("All laws should receive a sensible construction. General terms should be so limited in their application as not to lead to injustice, oppression, or an absurd consequence").

The Court's literal interpretation of the statute threatens to create a serious anomaly. It seems to say that a government cannot *ever* enforce a lien on property that it has sold on the installment plan as long as (1) the property is a license, (2) the buyer has gone bankrupt, and (3) the government wants the license back solely because the buyer did not pay for it. After all, in such circumstances, it is virtually *always* the case that the buyer will not have paid a debt that is in fact "dischargeable," and that "event" alone will have "trigger[ed]" the government's "decision" to revoke the license. See *supra*, at 310.

Yet every private commercial seller, every car salesman, every residential home developer, every appliance company can threaten repossession of its product if a buyer does not pay—at least if the seller has taken a security interest in the product. *E. g., Farrey* v. *Sanderfoot*, 500 U. S. 291, 297 (1991). Why should the government (state or federal), and the government alone, find it impossible to repossess a product, namely, a license, when the buyer fails to make installment payments?

The facts of these cases illustrate the problem. Next-Wave bought broadcasting licenses from the Federal Communications Commission (FCC) for just under $5 billion. It promised to pay the money under an installment plan. It agreed that its possession of the licenses was "conditioned upon full and timely payment," that failure to pay would result in the licenses' "automatic cancellation," that the Government would maintain a "fi[r]st lien on and continuing security interest" in the licenses, and that it would "not dispute" the Government's "rights as a secured party." 2 App. to Pet. for Cert. 388a, 392a–393a, 402a–404a. Next-Wave never made its installment payments. It entered bankruptcy. And the FCC declared the licenses void for nonpayment. In a word, the FCC sought to repossess the licenses so that it could auction the related spectrum space to other users. As I have said, the law ordinarily permits a

private creditor who has taken an appropriate security interest to repossess property for nonpayment—even after bankruptcy. See, *e. g., Farrey, supra,* at 297. Would Congress want to say that the Government cannot *ever* do the same?

## II

To read the statute in light of its purpose makes clear that Congress did not want *always* to prohibit the Government from enforcing a sales contract through repossession. Nor did it intend an interpretation so broad that it would threaten unnecessarily to deprive the American public of the full value of public assets that it owns. Cf. 47 U. S. C. §§ 309(j)(1)–(4) (authorization of spectrum auctions with restrictions "to protect the public interest"). Congress instead intended the statute's language to implement a less far-reaching, but more understandable, objective. It sought to forbid discrimination against those who are, or were, in bankruptcy and, more generally, to prohibit governmental action that would undercut the "fresh start" that is bankruptcy's promise, see *Grogan* v. *Garner,* 498 U. S. 279, 286 (1991). Where that kind of government activity is at issue, the statute forbids revocation. But where that kind of activity is not at issue, there is no reason to apply the statute's prohibition.

The statute's title, its language, and its history all support this description of its purpose. The title says, "Protection against discriminatory treatment." 11 U. S. C. § 525(a). The statute's text, read as a whole, see Appendix, *infra,* strongly suggests that bankruptcy-related discrimination is the evil at which the statute aims. A phrase is sometimes best known by the statutory company it keeps. See, *e. g., Gutierrez* v. *Ada,* 528 U. S. 250, 255 (2000). And here the relevant phrase is immersed within language that describes a host of acts, including discharges from employment and refusals to hire, and forbids them only where done solely for bankruptcy-related reasons, *i. e.,* a person's being a bank-

ruptcy debtor, having been a bankruptcy debtor, or having become insolvent before or during a bankruptcy case. See Appendix, *infra.*

The statute's history demonstrates an antidiscriminatory objective. House and Senate Reports describe the relevant section, § 525(a), as "the anti-discrimination provision." S. Rep. No. 95–989, p. 81 (1978) (hereinafter S. Rep.); H. R. Rep. No. 95–595, p. 367 (1977) (hereinafter H. R. Rep.). The House Report says that its "purpose . . . is to prevent an automatic reaction against an individual for availing himself of the protection of the bankruptcy laws." *Id.,* at 165. In describing related provisions, the House Report refers to an intent to prevent the Government from punishing "bankruptcy per se" by denying "a license, grant, or entitlement" on the premise "that bankruptcy itself is sufficiently repre-[h]ensible behavior to warrant . . . a sanction." *Id.,* at 286. It adds that the overriding goal was "to eliminate any special treatment of bankruptcy" in laws of the United States. *Id.,* at 285.

In addition, the House and Senate Reports describe § 525(a) as an effort to codify this Court's holding in *Perez* v. *Campbell,* 402 U. S. 637 (1971). S. Rep., at 81; H. R. Rep., at 165, 366. The Court there held that the federal Bankruptcy Act pre-empted a state statute that suspended the driver's license of any person who had not paid a motor accident judgment (explicitly including a judgment discharged by bankruptcy). 402 U. S., at 652. The Court rested its holding on the theory that the state statute's failure to exempt discharged debts "frustrate[d] the full effectiveness" of the Bankruptcy Act's promise of a "fresh start." *Ibid.*

Further, the House Report, along with House floor statements, assured the enacting Congress that the statute would allow "governmental units to pursue appropriate regulatory policies." *E. g.,* H. R. Rep., at 165. It was not meant "to interfere with legitimate regulatory objectives," 123 Cong.

Rec. 35673 (1977) (remarks of Rep. Butler); see also H. R. Rep., at 286. It might seem fair to count as one such objective the receipt by the public of payment for a partially regulated public asset that the public, through the Government, has sold. Cf. 47 U. S. C. § 309(j)(3)(C).

Finally, nothing in the statute's history suggests any congressional effort to prevent Government repossession where bankruptcy-related concerns, such as "fresh start" concerns, have no relevance. The statute does contain exemptions, but those exemptions, for agriculture-related licenses, are not to the contrary. 11 U. S. C. § 525(a). As I read the statute, the exemptions simply excuse, say, meatpacking licensing agencies from a rule that would otherwise forbid taking negative account of, say, a prior bankruptcy (say, by providing that a license "shall terminate upon [the] licensee . . . being discharged as a bankrupt," 7 U. S. C. § 499d(a); see *ante*, at 308–309, and n. 1 (STEVENS, J., concurring in part and concurring in judgment)). To read them as permitting consideration of former bankruptcies where the food supply is at issue makes them understandable. To read them as support for the majority's view—as authorizing the Government to revoke meatpacking, but only meatpacking, licenses upon nonpayment—makes little sense to me.

The statute's purposes, then, are to stop bankruptcy-related discrimination and to prevent government licensors from interfering with the "fresh start" that bankruptcy promises, but not to prevent government debt-collection efforts where these concerns are not present. Unlike the majority, I believe it possible to interpret the statute's language in a manner consistent with these purposes.

## III

The provision's congressional authors expected courts to look for interpretations that would conform the statute's language to its purposes. They conceded that the provision's

"ultimate contours" were "not yet clear." H. R. Rep., at 165. But they said that the courts would determine "the extent of the discrimination that is contrary to bankruptcy policy." *Ibid.* And they thought the courts would do so "in pursuit of sound bankruptcy policy." S. Rep., at 81; H. R. Rep., at 367.

One obvious way to carry out this interpretive mandate is to interpret the relevant phrase, "solely because" of nonpayment of "a debt that is dischargeable," as requiring something more than a purely factual connection, *i. e.,* something more than a causal connection between a government's revocation of a license and nonpayment of a debt that is, merely *in fact,* dischargeable. The statute's words are open to the interpretation that they require a certain relationship between (1) the *dischargeability* of the debt and (2) the decision to revoke the license. That necessary relationship would exist if the debt's dischargeability played a role in the government's decisionmaking through motivation—if, for example, the fact that the debt was dischargeable (or the fact of bankruptcy, etc.) *mattered* to the FCC. The necessary relationship would also exist if the government's revocation interfered in some significant way with bankruptcy's effort to provide a "fresh start." But otherwise, where the fact of dischargeability is irrelevant, where it has nothing to do with the government's decision either by way of purpose or effect, the government's license revocation would fall outside the scope of the provision.

This interpretation is consistent with the statute's language. It simply takes account not only of the statutory language's factual content—*i. e.,* its reference to a debt that is *in fact* dischargeable—but also its intended significance. A debt's dischargeability cannot simply be a coincidence but must bear a meaningful relation to the prohibited government action. Cf. *Staples* v. *United States,* 511 U. S. 600, 619–620 (1994) (statute forbidding possession of a machinegun requires not simply that the gun, *in fact,* discharge auto-

matically, but also that the defendant know that the gun meets the statute's description).

This interpretation is consistent with several lower court efforts to interpret the statute. See, *e. g., Toth* v. *Michigan State Housing Development Authority,* 136 F. 3d 477, 480 (CA6), cert. denied, 524 U. S. 954 (1998); *In re Exquisito Services, Inc.,* 823 F. 2d 151, 153 (CA5 1987); *In re Smith,* 259 B. R. 901, 906 (Bkrtcy. App. Panel CA8 2001). But see *In re Stoltz,* 315 F. 3d 80 (CA2 2002). It would avoid handicapping government debt collection efforts in ways that Congress did not intend. It would further the statute's basic purpose—preventing discrimination and preserving bankruptcy's "fresh start." And it would avoid interfering with legitimate public debt collection efforts. An individual could not generally promise to pay for a public asset, go into bankruptcy, avoid the payment obligation, and keep the asset—even in the absence of the evils at which this statute is aimed.

This statutory approach is far from novel. Well over a century ago, the Court interpreted a statute that forbade knowing and willful obstruction of the mail as containing an implicit exception permitting a local sheriff to arrest a mail carrier. *United States* v. *Kirby,* 7 Wall., at 485–487. Justice Field, writing for the Court, pointed out that centuries earlier the British courts had interpreted a statute making it a felony to break out of prison not to extend to a breakout when the prison is on fire. *Id.,* at 487. And, similarly, the courts of Bologna had interpreted a statute punishing severely " 'whoever drew blood in the streets' " not to extend to a surgeon faced with an emergency. *Ibid.* "[C]ommon sense," wrote Justice Field, "accepts" these rulings. *Ibid.* So too does common sense suggest that we should interpret the present statute not to extend to revocation efforts that are no more closely related to the statute's objectives than are baby strollers to the "vehicles" forbidden entry into the park. See *supra,* at 311.

## IV

The majority responds to my concerns in several ways. First, it characterizes the dissent in a slightly exaggerated manner, stating, for example, that I have "determine[d]" the statute's *"purpose"* in "splendid isolation from [its] language," that bankruptcy's "fresh start" objective "plays no real role in [my] analysis," and that that "criterion" is, in any event, "circular." *Ante,* at 305, and n. 4. I would refer the reader to Parts II and III above (which contain considerable discussion of statutory language and statutory history) and, in particular, to the discussion of *Perez,* a decision that relied upon the "fresh start" objective in a way that the statute seeks to codify and that my own suggested interpretation of the statute incorporates. In my view, the language of the statute taken as a whole—including its "insolvency" language, *ante,* at 305—strongly suggests that Congress intended bankruptcy to have something to do with the forbidden government action. See Appendix, *infra.*

Second, the majority argues that my interpretation makes the statute's "dischargeable debt" provision "superfluous," given language forbidding revocation because a person " 'is . . . a [bankruptcy] debtor.' " *Ante,* at 307 (emphasis deleted). I do not see how that is so. A refusal to issue, say, a new dry cleaner's license "solely because" a bankruptcy debtor once failed to pay for other dry cleaner's licenses (now discharged debts) is not necessarily the same as a refusal to issue a new license "solely because" the debtor "has been . . . a bankrupt," 11 U. S. C. § 525(a). And the statute's separate provisions simply cover this differentiated bankruptcy-related waterfront.

Third, the majority returns to the statutory language prohibiting a government from revoking a license "solely because [the bankrupt debtor] . . . has not paid a debt that is dischargeable," *ibid. Ante,* at 306–307. To my ear, this language suggests a possible connection between dischargeability and revocation. I have tried to test my linguistic

sense through analogy, imagining, for example, a regulatory rule telling apartment owners that they cannot refuse to rent "solely because a family has children who are adopted" (which, notwithstanding the majority's complex discussion of "destructive children," *ante*, at 306, seems linguistically comparable). This language suggests the need for a connection between (1) the fact of adoption and (2) the refusal (thereby exempting an owner who accepts no children at all). Is it not, like the statute's language, at least *open* to such an interpretation? That is the linguistic point. It opens the door to a consideration of context and purpose—which, *in any event*, are relevant to determine whether the statute contains an implicit exemption, see *supra*, at 317.

Finally, the majority points out that, in the wake of a complicated procedural history, these cases are now not about "enforcement of [a security] interest in" the Bankruptcy Court. *Ante*, at 307, and n. 5. But the majority's interpretation certainly seems to cover that circumstance, and more. Under the majority's understanding, a government creditor who seeks to enforce a security interest in a broadcasting license (after the bankruptcy stay has been lifted or after bankruptcy proceedings terminate) would be seeking to repossess, and thereby to revoke, that license "solely because" of the debtor's failure to pay a "dischargeable" debt. After all, under such circumstances, "failure to pay" the debt that is *in fact* dischargeable would "alone be the proximate cause" of the government's action. *Ante*, at 301. It is "the act or event that triggers the agency's decision to cancel, whatever the agency's ultimate motive." *Ante*, at 301–302.

If I am right about this, the majority's interpretation means that private creditors, say, car dealers, can enforce security interests in the goods that they sell, namely, cars, but governments cannot enforce security interests in items that they sell, namely, licenses. (Whether a private party can "take and enforce a security interest in an FCC license," *ante*, at 307, is beside this particular point.)

The matter is important. *In these very cases,* the Government sought to retake its licenses through enforcement of its security interest. See, *e. g., In re NextWave Personal Communications, Inc.,* 241 B. R. 311, 321 (SDNY) (affirming denial of the Government's motion for relief from the automatic stay under 11 U. S. C. § 362(d)(1)), rev'd, 200 F. 3d 43, 45–46, 62, and n. 1 (CA2 1999) (reversing that affirmance). The Court of Appeals for the District of Columbia Circuit indicated that the FCC's revocation of the licenses, see *ante,* at 307–308, is properly characterized as foreclosure on collateral—*i. e.,* as an attempt to enforce liens. See 254 F. 3d 130, 151 (CADC 2001); cf. *In re Kingsport Ventures, L. P.,* 251 B. R. 841, 844 (ED Tenn. 2000) (private party's power to use "revocation" to enforce interest in a license). But because the Court of Appeals rested its decision on § 525(a) grounds, it did not determine whether bankruptcy's automatic stay blocked such foreclosure. 254 F. 3d, at 148–149, 156. See generally 11 U. S. C. §§ 362(a)(4)–(5) (staying enforcement of liens). Consequently, if the majority believes that § 525(a) permits the Government to enforce security interests in its license collateral, it should remand these cases, permitting the Court of Appeals to decide whether other bankruptcy provisions (such as § 362) block the Government's efforts to do so.

I emphasize the point because the majority is right in thinking that lien-enforcement difficulties create much of the anomaly I fear—in effect divorcing the majority's reading from the statute's basic purpose. Is it not reasonable to ask for reassurance on this point, to ask what future interpretive corollary might rescue government lien-enforcement efforts from the difficulties the majority's statutory interpretation seems to create? Unless there is an answer to this question, the majority's opinion holds out no more than a slim *possibility* of ad hoc adjustment based upon future need. And such an adjustment, if it comes at all, may amount to mere judicial

fiat—used to rescue an interpretation that rests too heavily upon linguistic deduction and too little upon human purpose.

## V

Because the Government, asserting its security interest, may be able to show that revocation here bears no relationship to the debt's "dischargeability" and would not otherwise improperly interfere with the Code's "fresh start" objective, I would vacate the Court of Appeals' judgment and remand for further proceedings. I respectfully dissent.

## APPENDIX TO OPINION OF BREYER, J.

The full text of 11 U. S. C. § 525(a) states:

"Protection against discriminatory treatment

"(a) Except as provided in the Perishable Agricultural Commodities Act, 1930, the Packers and Stockyards Act, 1921, and section 1 of the Act entitled 'An Act making appropriations for the Department of Agriculture for the fiscal year ending June 30, 1944, and for other purposes,' approved July 12, 1943, a governmental unit may not deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, discriminate with respect to such a grant against, deny employment to, terminate the employment of, or discriminate with respect to employment against, a person that is or has been a debtor under this title or a bankrupt or a debtor under the Bankruptcy Act, or another person with whom such bankrupt or debtor has been associated, solely because such bankrupt or debtor is or has been a debtor under this title or a bankrupt or debtor under the Bankruptcy Act, has been insolvent before the commencement of the case under this title, or during the case but before the debtor is granted or denied a discharge, or has not paid a debt that is dischargeable in the case under this title or that was discharged under the Bankruptcy Act."