IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

October 13, 2008

Charles R. Fulbruge III
Clerk

No. 07-20499

CAESAR R CAMPBELL; PAMELA A CAMPBELL

Plaintiffs-Appellees

v.

COUNTRYWIDE HOME LOANS INC.

Defendant-Appellant

Appeal from the United States Bankruptcy Court
for the Southern District of Texas

Before HIGGINBOTHAM, STEWART, and SOUTHWICK, Circuit Judges.

SOUTHWICK, Circuit Judge:

The opinion issued in this case on August 26, 2008, is withdrawn, and this revised opinion is substituted. Our resolution of each issue remains the same.

The Plaintiffs, Caesar and Pamela Campbell, brought this suit against the purchase money lender on their residence, Countrywide Home Loans, Inc. They alleged Countrywide violated the automatic stay in their Chapter 13 bankruptcy. The bankruptcy court granted partial summary judgment in favor of the Campbells, finding that Countrywide had violated the automatic stay by the wording of the claim it filed. Countrywide was granted the right to appeal from this interlocutory order. We agree with the bankruptcy court's determination that certain unpaid amounts due under the Campbells' security agreement to

Countrywide were claims under the Bankruptcy Code, but reverse its holding that Countrywide's actions in the bankruptcy court violated the automatic stay.

## I. Factual and Procedural Background

The principal issue in this case is whether the following is a claim to be submitted by a lender under the Bankruptcy Code: the amount by which a bankrupt homeowner is delinquent in monthly payments for insurance and property taxes that are not yet due that would be maintained in escrow by the lender until they were due. The relevant loan was obtained on October 23, 2002, by Caesar Campbell, in the principal amount of $72,800, for the purchase of a home in Richmond, Texas. Caesar Campbell and his wife Pamela also executed a Texas Home Security Instrument. Countrywide is the servicer of the loan.

Under the terms of the Note and Security Instrument (collectively "loan documents"), the Campbells' monthly mortgage payment contained two distinct elements. The first was a monthly payment for principal and interest in the amount of $620.13. In addition, the loan documents provided Countrywide the right (which it exercised) to collect other amounts on a monthly basis to cover expenses such as insurance and taxes, to retain these payments in an escrow account, and to pay these expenses as they became due.

The amount Countrywide could collect as a monthly escrow is governed by the Real Estate Settlement Procedures Act ("RESPA"). 12 U.S.C. § 2601 et seq. RESPA provides that a loan servicer can estimate the property taxes and insurance that will be due on the property for the ensuing twelve months and adjust the monthly payments under the mortgage by 1/12 of the total calculations to cover the estimated expenses. RESPA also allows the lender to include an additional 1/6 of the monthly escrow payment to provide a cushion to cover any estimate shortfalls. See id. § 2609(a)(1).

On April 3, 2006, the Campbells filed a Voluntary Petition under Chapter 13 of the Bankruptcy Code. Countrywide was listed as a creditor and filed a

Proof of Claim on April 10, 2006. Countrywide's Proof of Claim was for $16,348.32. Countrywide had three categories of claims. First, Countrywide listed fifteen delinquent pre-petition monthly principal and interest payments. Second, Countrywide's claim included amounts that Countrywide expended to cover escrow expenses in years prior to the petition year (with credit for any escrow payments made by the Campbells). Finally, Countrywide included certain other costs and fees it was entitled to recover under the loan documents. Countrywide did not include in its claim the unpaid escrow payments that accrued between January 2006 and the date of the Campbells' bankruptcy petition in April 2006.

Significant for this appeal, in addition to its listed claims, Countrywide included the following language in its Proof of Claim – indicating that Countrywide intended to increase the Campbells' monthly mortgage payment post-petition:

> THE POST PETITION PAYMENT FOR THIS LOAN IS $1,047.35.
> EFFECTIVE 6/1/2006 THE POST PETITION PAYMENT WILL
> INCREASE TO $1,124.97 . . . .

The increased amount would have recouped the escrow monthly payments that were unpaid beginning in January 2006 and ending on the filing of the bankruptcy petition in April 2006. The Campbells filed an objection to this increase in the mortgage payment. The bankruptcy court ultimately approved Countrywide's $16,348.32 arrearage claim but disallowed the increased mortgage payment. The confirmed plan required mortgage payments in the amount of the Campbells' pre-petition payments.

According to the Campbells' complaint, Countrywide's actions were an impermissible attempt to "recover a claim against the debtor that arose before the commencement of the case." 11 U.S.C. § 362(a)(6). The bankruptcy court agreed with the Campbells – granting partial summary judgment and holding that Countrywide's actions were an attempt to collect a pre-petition debt. The

court also held that this action constituted a willful violation of the automatic stay. Countrywide challenges both the finding that it was attempting to collect a pre-petition debt and the finding that its actions violated the automatic stay. The statute under which the Campbells bring their claim allows costs, attorneys' fees, and punitive damages in certain circumstances. 11 U.S.C. § 362. The bankruptcy court left open the issue of damages. The bankruptcy court granted Countrywide's petition for permission to appeal under 28 U.S.C. § 158. We subsequently granted Countrywide's petition to appeal.

## II. Discussion

(a)     The contractual relationship between the Campbells and Countrywide

We review a summary judgment entered by a bankruptcy court for genuine issues of material fact and for whether the movant was legally entitled to judgment. In re: Ark-La-Tex Timber Co., 482 F.3d 319, 328 (5th Cir. 2007).

To understand the relevant law, we begin with the relationship that the loan documents established between Countrywide and the Campbells. The promissory note set the principal and interest on the loan. These provisions in the mortgage documents required monthly escrow payments:

> 1. Payment of Principal, Interest, Escrow Items, and Late Charges. Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3.
>
> . . .
>
> 3. Funds for Escrow Items. Borrower shall pay to Lender on the day Periodic Payments [defined as "the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 [Escrow Items] of this Security Agreement"] are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes . . .; (c) premiums for any and all insurance required by Lender . . . . These items are called "Escrow Items." . . . Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items.

. . .

> Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow items or otherwise in accordance with Applicable Law.
>
> . . .
>
> 4. Charges; Liens. Borrower shall pay all taxes . . . attributable to the Property which can attain priority over this Security Instrument . . . . To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Upon the Campbells' failure to make their monthly mortgage payment, the loan documents granted Countrywide the right to "do and pay for whatever is appropriate to protect Lender's interest in the Property and rights under the Security Instrument . . . ." Though Countrywide disputes that the unpaid escrow amounts were Bankruptcy Code "claims," it concedes that it had the right under the just-quoted provision to proceed against the Campbells for unpaid monthly mortgage payments, including escrow sums. We find that under the loan documents, the Campbells had an obligation to pay, and Countrywide had a right to collect, past-due mortgage payments.

Though Countrywide had contractual rights to collect the principal, interest, and escrow amounts, its argument for not having to file these unpaid amounts as a claim arises from additional rights under RESPA (which are expressly incorporated by the loan documents). RESPA arguably allowed Countrywide to recalculate monthly escrow payments if necessary to ensure that there would be a sufficient balance in the Campbells' escrow account to satisfy the escrow expenses as they became due. According to Countrywide, RESPA allows recalculation any time there are insufficient funds in the escrow account to cover escrow expenses in the ensuring year. Though that may be true, the issue is whether such a right overrides bankruptcy principles.

(b)    The Campbells' bankruptcy

We now turn to the relevant portions of the Bankruptcy Code. After a bankruptcy petition is filed, an automatic stay arises in favor of the debtor. The stay prohibits "all entities" from making collection efforts against the debtor or the property of the debtor's estate. 11 U.S.C. § 362(a). The stay prohibits the collection of any pre-petition debt but does not apply to claims that arise post-petition. United States v. Ripley (In re Ripley), 926 F.2d 440, 443 (5th Cir. 1991).

While the automatic stay halts collection efforts, the Bankruptcy Code provides creditors a procedure to assert claims against the debtor's estate. The Bankruptcy Code entitles each creditor of the bankrupt "to file a proof of claim – i.e., a document providing proof of a 'right to payment' . . . against the debtor's estate." Travelers Cas. & Sur. Co. of Am. v. Pac. Gas & Elec. Co., 127 S. Ct. 1199, 1204 (2007) (quoting 11 U.S.C. § 101(5)(a)). A "claim" is a "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured." 11 U.S.C. § 101(5)(a). The concept of a claim is broad, and it includes "all legal obligations of the debtor, no matter how remote or contingent . . . [that will] be dealt with in the bankruptcy case." In re Egleston, 448 F.3d 803, 812 (5th Cir. 2006).

(c)    The Countrywide claim

Having set out the relevant contractual and statutory provisions, we now turn to the first question raised in this appeal: when the Campbells failed to pay the escrow portion of their mortgage payment between January and April 2006, and then filed bankruptcy, were these unpaid amounts a "claim" which Countrywide was prohibited from recovering post-petition without authorization of the bankruptcy court?

Countrywide alleges that it had no "claim" to the January through April escrow payments at the time that the Campbells filed bankruptcy. Instead,

Countrywide argues that a claim for the unpaid escrow payments would only accrue when Countrywide paid an escrow expense, and there were insufficient funds in the escrow account to cover the expenses. For example, Texas property taxes are assessed and billed in October and become due in January. Countrywide argues that it had no claim to assert regarding the property taxes until its payment of taxes created a deficit in the Campbells' escrow account. Countrywide asserts that its position is supported by RESPA, which requires Countrywide to make payments from the escrow account for taxes "as such payments become due." 12 U.S.C. § 2605(g).

Countrywide's imaginative argument disregards its rights and the debtor's obligations under the loan documents. We have discussed that Countrywide had the contractual right to proceed against the Campbells upon a failure to pay monthly escrow payments. The "touchstone of any 'claim' is that there is an 'enforceable obligation' of the debtor or an enforceable 'right to payment' from the debtor." Carrieri v. Jobs.com Inc., 393 F.3d 508, 524 (5th Cir. 2004). There was a right to the pre-petition escrow payments – which matured into a claim on behalf of Countrywide – each time the Campbells failed to make the payment. Countrywide's argument that it had no rights against the Campbells until the escrow expenses were paid ignores the terms of the loan documents.

Countrywide responds that the loan documents incorporate its rights under RESPA. It points to a provision in RESPA that a servicer such as Countrywide "shall not be prohibited from requiring additional monthly deposits in such escrow account to avoid or eliminate such deficiency." 12 U.S.C. § 2609(a). Based on this contractual right, Countrywide argues that it is entitled to disregard the January through April escrow defaults, recalculate the monthly escrow estimates, and increase the mortgage payments post-petition in the manner that it did. Countrywide argues that any attempt by the bankruptcy court to modify its right to recalculate the escrow payments (and increase the

mortgage payment post-petition) is a violation of 11 U.S.C. § 1322(b)(2), which provides that a bankruptcy court does not have the power to modify the rights of a secured creditor whose claim is secured only by a security interest in real property that is the debtor's principal residence.

We agree with the bankruptcy court that the pre-petition escrow payments are a "claim" for purposes of the automatic stay, a holding that does not limit Countrywide's rights under RESPA or the Bankruptcy Code. The automatic stay operates to halt collection of pre-petition claims, even those claims held by a creditor protected by the anti-modification provision of Section 1322(b)(2):

> [E]ven if a claim secured only by a security interest in real property used as the principal residence of the debtor is not subject to modification under the chapter 13 plan by reason of section 1322(b)(2), the holder of such claim is nonetheless stayed from collection of its claim, from taking possession of the real property encumbered by the lien, and from enforcement of its lien. The holder of such a claim must obtain relief from the automatic stay before proceeding unless the stay does not come into effect or terminates because of a prior bankruptcy filing.

8 COLLIER ON BANKRUPTCY ¶ 1322.06[1][a] (15th ed. rev. 2007). The stay does not determine a creditor's claim but merely suspends an action to collect the claim outside the procedural mechanisms of the Bankruptcy Code. Therefore, staying Countrywide's attempt to collect pre-petition escrow amounts does not bar Countrywide from asserting its contractual rights in the bankruptcy court.

Our decision is a narrow one. We determine only that unpaid escrow payments that accumulate pre-petition in the year that a bankruptcy petition is filed, and which the creditor had a right to collect under the loan documents, constitute a "claim" under the Bankruptcy Code. We do not address a right to recalculate the amount of escrow payments in subsequent years.

In sum, we affirm the bankruptcy court's determination that the escrow obligations that arose pre-petition were "claims" of Countrywide as that term is

utilized in the Bankruptcy Code. Countrywide could not attempt to collect those amounts post-petition. We now turn to whether the bankruptcy court properly held that Countrywide violated the automatic stay.

(d)     Violation of the automatic stay

When a bankruptcy petition is filed, an automatic stay operates as a self-executing injunction. The stay prevents creditors from taking any collection actions against the debtor or the property of the debtor's estate for pre-petition debts. 11 U.S.C. § 362(a). When the automatic stay is violated, the Bankruptcy Code creates a private right of action in favor of the debtor:

> [A]n individual injured by any willful violation of a stay provided by this section shall recover actual damages, including costs and attorney's fees, and, in appropriate circumstances, may recover punitive damages.

Id. § 362(k). This court has held that a "willful" violation of the automatic stay means acting with knowledge of the stay:

> A willful violation does not require a specific intent to violate the automatic stay. Rather, the statute provides for damages upon a finding that the defendant knew of the automatic stay and the defendant's actions which violated the stay were intentional. Whether the party believes in good faith that it had a right to the property is not relevant to whether the act was "willful" or whether compensation must be awarded.

In re Chesnut, 422 F.3d 298, 302 (5th Cir. 2005) (citation omitted). Therefore, to establish an actionable violation of the automatic stay, the Campbells must establish: (1) that Countrywide knew of the existence of the stay; (2) that Countrywide's actions were willful; and (3) that Countrywide's actions violated the automatic stay. In re Repine, 536 F.3d 512, 519 (5th Cir. 2008). It is undisputed that Countrywide knew of the existence of the stay and that it acted willfully and intentionally when it asserted the right to an increased mortgage payment in its Proof of Claim. The only legitimate issue is whether Countrywide's actions violated the stay.

The bankruptcy court noted that "Countrywide does not dispute that it increased the monthly mortgage payment to account for the Debtors' 2006 property taxes." Indeed, there was no factual dispute below on that point. The argument has been over characterizing the increase. Countrywide asserts that assuring that the escrow account was fully-funded before taxes were next due was not the collection of a pre-petition debt. It argues that the only pre-petition debt relating to the escrow items consists of Countrywide's payments made without having adequate funds in the account. We have disagreed and found that missed payments that would have built up the escrow account for charges not yet due was also a debt that Countrywide needed to file as a claim.

The bankruptcy court then held that by including these amounts in its Proof of Claim, Countrywide violated the automatic stay. In assessing the validity of that conclusion, we review Countrywide's actions. In the Proof of Claim it filed, there was a paragraph stating that the Campbells' post-petition payments would be higher. Countrywide did not collect this new amount or take any action outside the bankruptcy proceeding to collect it. We must decide whether making an assertion in a Proof of Claim violates the automatic stay.

Certain categories of actions are statutorily identified as prohibited by the automatic stay, including: (1) the commencement or continuation of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the bankruptcy filing; (2) enforcement of a judgment obtained before the commencement of the bankruptcy case; (3) acts to obtain possession or exercise control over property of the bankruptcy estate; (4) acts to create, perfect, or enforce a lien against property of the bankruptcy estate; (5) acts to create, perfect, or enforce liens against property of the debtor (as opposed to property of the bankruptcy estate); (6) any act "to collect, assess, or recover a claim against the debtor that arose before the commencement" of the bankruptcy case; (7) any setoff of a debt owing to the debtor that arose pre-

10

petition; and (8) the commencement or continuation of certain proceedings before the United States Tax Court. 11 U.S.C. § 362(a)(1) - (8); see generally 3 COLLIER ON BANKRUPTCY ¶ 362.03 (15th ed. rev. 2007).

None of these sections bars a creditor's filing a Proof of Claim pursuant to Section 501 of the Bankruptcy Code. We find no precedents in which a court has held that asserting a right to payment in a Proof of Claim constitutes a violation of the automatic stay.[1] In fact, a number of courts, including the District of Columbia Circuit, have found that an automatic stay has no effect on actions that are expressly allowed under the Bankruptcy Code. United States v. Inslaw, Inc., 932 F.2d 1467, 1474 (D.C. Cir. 1991). In a case similar to ours, the Bankruptcy Court for the District of South Carolina put a finer point on this more general principle:

> [T]he automatic stay serves to protect the bankruptcy estate from actions taken by creditors outside the bankruptcy court forum, not legal actions taken within the bankruptcy court. The filing of a Proof of Claim before a bankruptcy court . . . is the logical equivalent of a request for relief from the automatic stay, which cannot itself constitute a violation of the stay . . . .

In re Sammon, 253 B.R. 672, 681 (Bankr. D.S.C. 2000); see also Rogers v. B-Real, L.L.C. (In re Rogers), 391 B.R. 317, 324 (Bankr. M.D. La. 2008) (adopting In re Sammon's analysis and collecting other cases that have done so).

The just-quoted In re Sammon opinion analyzed procedural rules, Code provisions, and case law before concluding that even the filing of a "grossly overstated" amount on a Proof of Claim would not violate the automatic stay. 253 B.R. at 680. Most convincing to us is the point that there would not be any damages because any disagreement with the claim may be addressed

---

[1] Our discussion is limited to whether Countrywide's conduct in this case constitutes a violation of the automatic stay under Section 362. Of course, the bankruptcy court has other mechanisms to impose sanctions on parties who may attempt to abuse the procedural mechanisms within the bankruptcy court. See 11 U.S.C. § 105; Fed. R. Bankr. P. 9011.

immediately by the debtor's counsel by responding to that official court filing. Id. at 681. Indeed, a dispute within the bankruptcy court over the Countrywide filing began almost immediately.

The analysis in these cases is persuasive. The Bankruptcy Code allows creditors to assert any claim, even if that claim is contingent, unmatured, or disputed. 11 U.S.C. §§ 101(5), 501(a). A debtor may object to the claim; the bankruptcy court then determines whether to allow the claim. 11 U.S.C. § 502; see Simmons v. Simmons (In re Simmons), 765 F.2d 547, 552 (5th Cir. 1985) (filing an objection "join[s] issue in a contested matter, thereby placing the parties on notice that litigation is required to resolve an actual dispute between the parties"). In this case, Countrywide filed a claim asserting a right to increased mortgage payments under the loan documents. The Campbells objected, and the bankruptcy court sustained the objection. These actions were permitted by the Bankruptcy Code and did not violate the automatic stay.

For the foregoing reasons, we agree with the bankruptcy court's determination that the pre-petition monthly escrow payments were a pre-petition "claim" of Countrywide, but we REVERSE and RENDER on the holding that Countrywide's actions violated the automatic stay.