**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 09-2724
_____

In re:  FRANCISCO RODRIGUEZ;
ANNA RODRIGUEZ,

Appellants


APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
(D.C. Civil No. 08-cv-05207)
District Judge:  Honorable Anne E. Thompson
_____

Argued:  September 14, 2010
_____

Before: SLOVITER, BARRY and SMITH, <u>Circuit Judges</u>

(Opinion Filed: December 23, 2010)
_____

Steven J. Abelson, Esq. (Argued)
63 West Main Street
P.O. Box 7005
Freehold, NJ 07728

<u>Counsel for Appellants</u>


W. Scott Hastings, Esq. (Argued)
Thomas A. Connop, Esq.

1

Locke Lord Bissell & Liddell
2200 Ross Avenue
Suite 2200
Dallas, TX 75201-6776
        -and-
Sarah M. Chen, Esq.
Joseph N. Froehlich, Esq.
Locke Lord Bissell & Liddell
3 World Financial Center
New York, NY 10281

Counsel for Appellee

_____

OPINION OF THE COURT
_____

BARRY, Circuit Judge

In this appeal, we are called upon to determine whether the automatic stay provisions of the Bankruptcy Code prohibit a lender from seeking to recoup unpaid pre-petition escrow payments from a bankrupt debtor outside the confines of the bankruptcy proceeding. The Bankruptcy Court and the District Court found that Countrywide Home Loans, Inc. ("Countrywide") did not have a pre-petition claim against Francisco and Anna Rodriguez and thus did not violate the automatic stay when it recalculated the Rodriguezes' post-petition escrow payments on their mortgage account to include certain pre-petition escrow arrears. For the following reasons, we will vacate the order of the District Court and remand for further proceedings consistent with this Opinion.

## I. Factual and Procedural Background

The Rodriguezes financed the purchase of their home in Monmouth County, New Jersey, with a purchase-money mortgage from First Mutual Corp., with Countrywide acquiring the mortgage thereafter. Under the terms of the mortgage, the Rodriguezes' monthly payments consisted of (1) an amount to cover principal, interest, and any late fees, and (2) an amount to cover taxes, insurance, and "other charges." App. at 119-20. The second part of the monthly payment—for taxes, insurance, and other charges—was to be paid into an escrow account and used, as needed, by Countrywide to pay for those expenses as they became due.

As permitted by the Real Estate Settlement Procedures Act of 1974 ("RESPA"), 12 U.S.C. § 2601 *et seq.*, Countrywide required the Rodriguezes to pay an amount into the escrow account that was higher than required to cover the actual cost of taxes, insurance, and other charges. RESPA permits a mortgagee to determine the amount of a debtor's monthly payment by estimating the property taxes and insurance that will be due over the ensuing twelve months and to add a reserve requirement equal to one-sixth of that total estimate. *See* 12 U.S.C. § 2609(a)(1).

The Rodriguezes fell behind on their mortgage payments and filed a voluntary petition for relief under Chapter 13 of the Bankruptcy Code on October 10, 2007. At the time of filing, they were $20,844.40 in arrears on eight months of mortgage payments, plus foreclosure fees and costs. While the bulk of the arrearage was for principal and interest payments, $5,657.60[1]

---

[1] The Bankruptcy Court calculated the total escrow arrearage at $6,364.80, apparently by multiplying the monthly escrow amount ($707.20) by eight months and then adding a ninth month for the first post-petition deposit, which is how Countrywide represented the arrearage. The discrepancy is immaterial to our decision.

was an escrow arrearage for taxes, insurance, and other charges. Of the $5,657.60 amount, $3,869.91 was attributable to payments which Countrywide had already made for taxes, insurance, and other charges. The remaining $1,787.69 was the amount for which Countrywide had not made corresponding payments for taxes, insurance, and other charges. In other words, the $1,787.69 amount was Countrywide's cushion. Despite this arrearage, at the time of the bankruptcy filing, the Rodriguezes' escrow account showed a projected surplus of $2,494.89, although the actual balance was a negative amount due to the missing escrow payments.

After the bankruptcy filing, Countrywide issued to the Rodriguezes a revised escrow analysis and demand for payment which indicated that Countrywide had boosted the monthly escrow payment amount to $947.77 from $707.20. The new $947.77 figure was comprised of $650.10 for the base escrow payment, $210.65 for the "[s]hortage payment," and $87.02 for the "[r]eserve requirement." App. at 64. The basis for the increased escrow amount was a post-petition escrow shortage.

Countrywide calculated the revised escrow payments by presuming that the escrow balance at the time of the bankruptcy filing was $0.00 because the Rodriguezes had not contributed any funds to the account. In other words, Countrywide did not treat the $1,787.69 cushion as funds that existed at the time of the bankruptcy filing. Instead, by starting with a balance of $0.00 in the escrow account, Countrywide calculated the post-petition escrow shortage as including the $1,787.69 cushion that the Rodriguezes had never, in fact, paid.

On December 2, 2007, the Rodriguezes filed a motion in the Bankruptcy Court to enforce the automatic stay pursuant to 11 U.S.C. § 362(a), compel Countrywide to "cease post[-]petition collection of pre-petition escrow claims," and award the Rodriguezes attorneys fees and costs. *Id.* at 1-10; *id.* at 4. The denial of that motion, affirmed by the District Court, is the subject of this appeal.

4

On January 15, 2007, Countrywide filed its proof of claim with the Bankruptcy Court. Countrywide sought a total of $21,283.71 in pre-petition arrears, including $3,869.91 for the pre-petition escrow deficiency, which was the amount that Countrywide actually had paid out for taxes, insurance, and other charges. In other words, Countrywide did not seek to recoup the $1,787.69 cushion via the bankruptcy process, but rather by assessing the Rodriguezes higher post-petition monthly escrow payments to make up for the shortfall.

The Rodriguezes argued to the Bankruptcy Court and then to the District Court that Countrywide was required to submit the entire escrow shortage as part of its proof of claim in the bankruptcy proceeding, and that the Bankruptcy Code's automatic stay forbids collecting any of the pre-petition shortfall by increasing the amount of the post-petition escrow payments. The Bankruptcy Court and District Court disagreed, holding that the amount by which a bankrupt homeowner is delinquent in monthly payments that would be maintained in escrow by the lender until the amount was due is not subject to the automatic stay. This appeal followed.

## II. Jurisdiction and Standard of Review

The District Court had jurisdiction under 28 U.S.C. § 158(a). We have jurisdiction under 28 U.S.C. §§ 158(d) and 1291 and "exercise the same standard of review as the District Court when it reviewed the original appeal from the Bankruptcy Court." *In re Handel*, 570 F.3d 140, 141 (3d Cir. 2009). Thus, we review the Bankruptcy Court's findings of fact for clear error and exercise plenary review over that Court's legal determinations. *Id*.

5

## III.  Discussion

### A.    Countrywide's Post-Petition Escrow Recalculation

The issue before us is whether the automatic stay prevents Countrywide from accounting for the pre-petition escrow shortage in its post-petition calculation of the Rodriguezes' future monthly escrow payments.  The automatic stay, under section 362(a) of the Bankruptcy Code, is triggered upon the filing of a bankruptcy petition.  That section provides that "any act to collect, assess, or recover a claim against the debtor that arose before the commencement of the case," outside the course of the bankruptcy proceeding, is stayed during the bankruptcy case.  11 U.S.C. § 362(a)(6).  The automatic stay is applicable only to claims that arise pre-petition, and not to claims that arise post-petition.  *See In re Grossman's Inc.*, 607 F.3d 114, 122 (3d Cir. 2010) (en banc).

Crucial to our determination of whether Countrywide violated the automatic stay is whether it had a "claim" against the Rodriguezes for the unpaid $1,787.69 prior to the Rodriguezes' bankruptcy filing.  If Countrywide had no claim for the unpaid escrow amount until that amount was, in fact, needed to cover taxes, insurance, and other charges that were due, then Countrywide had no right to collect those monies pre-petition and it could not have violated the automatic stay.

The Bankruptcy Code defines "claim" very broadly to mean:

> (A) right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; or

6

(B) right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured.

11 U.S.C. § 101(5).

In reviewing § 101(5), the Supreme Court observed that the language "right to payment" in the definition of "claim" meant "nothing more nor less than an enforceable obligation[.]" *Johnson v. Home State Bank*, 501 U.S. 78, 83 (1991). It reiterated that "Congress intended by this language to adopt the broadest available definition of 'claim.'" *Id.*; *see also FCC v. NextWave Pers. Commc'ns Inc.*, 537 U.S. 293, 302 (2003).

In *Grossman*'s, this Court, sitting en banc, endorsed this broad interpretation of the term "claim," overruling the narrow "accrual test" established in *Avellino & Bienes v. M. Frenville Co.*, which focused on the phrase "right to payment" in § 101(5) and when the right arose. *Grossman*'s, 607 F.3d at 121, overruling *Frenville*, 744 F.2d 332 (3d Cir. 1984). We explained that this focus on the "right to payment" failed "to give sufficient weight" to the other words in the statutory definition that modified the term "claim," *i.e.*, "contingent," "unmatured," and "unliquidated." 607 F.3d at 121. These modifiers, we concluded, mean that a "'claim' can exist under the [Bankruptcy] Code [by virtue of the terms 'contingent,' 'unmatured,' and 'disputed,'] before a right to payment exists under state law." *Id.*

With this definition in mind, we turn to the terms of the mortgage. The mortgage held by Countrywide specified the Rodriguezes' required payments and Countrywide's right to

7

accelerate the payment date and seek foreclosure in case of default:

> 2. Monthly Payment of Taxes, Insurance, and Other Charges. Borrower shall include in each monthly payment, together with the principal and interest as set forth in the Note and any late charges, a sum for (a) taxes and special assessments levied or to be levied against the Property . . . . [T]hese items are called "Escrow Items" and the sums paid to Lender are called "Escrow Funds."
>
> . . .
>
> The Escrow Funds are pledged as additional security for all sums secured by this Security Instrument.
>
> . . .
>
> 7. Charges to Borrower and Protection of Lender's Rights in the Property. Borrower shall pay all governmental or municipal charges, fines and impositions that are not included in paragraph 2.
>
> . . .
>
> If Borrower fails to make these payments or the payments or the payments required by paragraph 2, or fails to perform any other covenants and agreements contained

8

in this Security Instrument . . . then Lender may do and pay whatever is necessary to protect the value of the Property and Lender's rights in the Property, including payment of taxes, hazard insurance and other items mentioned in paragraph 2.

. . .

9. Grounds for Acceleration of Debt.

(a) Default. Lender may, except as limited by regulations issued by the Secretary in the case of payment defaults, require immediate payment in full of all sums secured by this Security Instrument if:

(i) Borrower defaults by failing to pay in full any monthly payment required by this Security Instrument prior to or on the due date of the next monthly payment, or

(ii) Borrower defaults by failing, for a period of thirty days, to perform any other obligations contained in this Security Instrument.

. . .

18. Foreclosure Procedure. If Lender requires immediate payment in full under paragraph 9, Lender

may foreclose this Security Instrument by judicial proceeding, and any other remedies permitted by applicable law.

App. 118-123.

The Bankruptcy Court concluded that Countrywide's recalculation of the Rodriguezes' post-petition monthly escrow payments did not violate any provision of the Bankruptcy Code. The Court explained that the pre-petition "claim" was limited to amounts that Countrywide had a right to retain and not merely a right to collect. Under that reasoning, no debt to Countrywide arose until Countrywide had, in fact, made a corresponding payment for taxes or insurance. The Court was concerned that requiring Countrywide to recover the full past-due escrow amount through the bankruptcy process would have the effect of requiring Countrywide to give the Rodriguezes an interest-free loan for the entire course of the Chapter 13 plan. It explained that RESPA permitted Countrywide to recalculate escrow payments to avoid a shortage and that the Rodriguezes had failed "to explain satisfactorily why such rights afforded lenders under RESPA should be abrogated in the context of a Chapter 13 bankruptcy proceeding." App. at 143. It further explained that Countrywide "serves merely as a conduit" for tax and insurance payments "and should only recover in bankruptcy for such items actually disbursed on behalf of mortgagors." *Id.* at 145. The District Court agreed with the Bankruptcy Court's conclusion that Countrywide was free to include the pre-petition escrow shortage in its post-petition calculation of the Rodriguezes' future monthly escrow payments.

On appeal, the Rodriguezes argue that under the broad definition of "claim," when they fell behind on their mortgage payments Countrywide had a claim for the pre-petition escrow deficiency, including the $1,787.69 cushion. Accordingly, the argument goes, Countrywide violated the automatic stay by taking into account part of the pre-petition escrow deficiency in

10

calculating their post-petition escrow payments. Countrywide responds that the word "claim," as used in Section 101(5), is limited to debt, and that "[a]n escrow account is not a debt . . . [but rather] is an asset held by the servicer for the borrower that is used to pay the borrower's tax and insurance obligations and to protect the lender's collateral." Appellee's Br. at 16. In support of this narrow definition of "claim," Countrywide cites *Johnson*, in which the Supreme Court stated, in a footnote addressing a different issue (determining which liabilities are extinguished in a bankruptcy case), that "debt" "has a meaning coextensive with that of 'claim.'" 504 U.S. at 84 n.5. Under Countrywide's view, if it foreclosed and sold the property, the Rodriguezes would certainly not be liable for the escrow shortfall related to the cushion because at that point there would be no future payments and thus no need for a cushion. Instead, according to Countrywide, the Rodriguezes would be liable for the escrow shortfall corresponding to payments Countrywide actually made for taxes and insurance. Thus, Countrywide contends, the shortage with respect to the escrow cushion is not a debt, and instead is merely a security interest.[2]

---

[2] Relying on *In re Villarie*, 648 F.2d 810 (2d Cir. 1981), Countrywide also argues that despite how broadly "claim" has been defined by Congress and the courts, it cannot bring a claim for the missed pre-petition escrow payments because the mortgage does not provide it with an enforceable right to do so. Separate and apart from the fact that *Villarie* has little or no relevance here as it involved the interpretation of a particular provision of New York City administrative law, we see nothing in the mortgage that would prevent Countrywide from suing for the payments or that would limit its options to acceleration of a debt and foreclosure. We note in passing that in *Campbell v. Countrywide Home Loans, Inc.*, 545 F.3d 348 (5th Cir. 2008), the relevant terms of the loan documents were almost exactly the same as the relevant terms of the mortgage here, yet Countrywide took the position that it had the right to proceed against the Campbells for the unpaid escrow. It is unclear why it has changed its position.

11

The Court of Appeals for the Fifth Circuit addressed a substantially similar question in *Campbell v. Countrywide Home Loans, Inc.*, 545 F.3d 348 (5th Cir. 2008). In *Campbell*, the security instrument to which the lender and the debtors were parties had terms similar to those here, including a term authorizing the lender (coincidentally, Countrywide) the right to collect regular payments to cover insurance and tax expenses and to retain those funds in an escrow account for payment as the expenses became due. 545 F.3d at 350-51. After the debtors filed for bankruptcy, Countrywide filed a proof of claim that did not include unpaid escrow amounts, but indicated in its proof of claim that it intended to increase the debtors' monthly mortgage payments post-petition to recoup the unpaid pre-petition escrow amounts. *Id.* at 351. The debtors filed suit, alleging that Countrywide violated the automatic stay, and the bankruptcy court granted partial summary judgment in favor of the debtors, holding that Countrywide had impermissibly attempted to collect a pre-petition debt and that its actions violated the automatic stay. *Id.*

Countrywide argued to the Fifth Circuit that it had no "claim" to the unpaid escrow amounts because a claim only accrued when Countrywide paid an escrow expense. *Id.* at 353. The Fifth Circuit rejected Countrywide's "imaginative argument," and, relying on the terms of the loan documents, found that Countrywide had a claim against the debtors each time the debtors failed to make an escrow payment. *Id.* at 353-54. The Fifth Circuit stated that "[t]he touchstone of any 'claim' is . . . an enforceable 'right to payment' from the debtor." *Id.* (citation and quotation marks omitted). Because the loan documents provided Countrywide with recourse, Countrywide had a claim against the debtors prior to the bankruptcy filing when the debtors failed to pay required escrow amounts. *Id.*

The Fifth Circuit rejected Countrywide's arguments that (a) RESPA allowed it to recalculate the post-petition mortgage payments in the manner it used; and (b) under 11 U.S.C. §

1322(b)(2),[3] the bankruptcy court did not have the power to modify Countrywide's right to recalculate the mortgage payments. The Fifth Circuit stated that its holding did not limit Countrywide's rights under RESPA or the Bankruptcy Code, and that "[t]he automatic stay operates to halt collection of pre-petition claims, even those claims held by a creditor protected by the anti-modification provision of Section 1322(b)(2)." *Id.* at 354 (citing 8 Collier on Bankruptcy ¶ 1322.06[1][a] (15th ed. Rev. 2007)). It reached this conclusion because "[t]he stay does not determine a creditor's claim but merely suspends an action to collect the claim outside the procedural mechanisms of the Bankruptcy Code. Therefore, staying Countrywide's attempt to collect pre-petition escrow amounts does not bar Countrywide from asserting its contractual rights in the bankruptcy court." *Id.*

Finally, although the Fifth Circuit held that Countrywide had a pre-petition claim to the unpaid escrow amounts, it reversed the bankruptcy court's determination that Countrywide had violated the automatic stay because Countrywide did not collect the increased post-petition escrow amount "or take any action outside the bankruptcy proceeding to collect it." *Id.* at 355. Simply asserting in a proof of claim that the debtors owed a higher escrow payment did not violate the automatic stay. *Id.*

The Bankruptcy Court ruled on the Rodriguezes' motion approximately three months before the Fifth Circuit decided *Campbell*. The District Court noted that decision, but discussed, albeit briefly, only the Fifth Circuit's conclusion that Countrywide had not violated the automatic stay, and concluded that the Fifth Circuit "did not actually reach the issue at hand in the instant appeal." App. at 166. That, of course, was incorrect.

---

[3]     Section 1322(b)(2) states that a bankruptcy plan may "modify the rights of holders of secured claims, other than a claim secured only by a security interest in real property that is the debtor's principal residence, or of holders of unsecured claims, or leave unaffected the rights of holders of any class of claims." 11 U.S.C. § 1322(b)(2).

We find *Campbell* persuasive. It instructs that the loan documentation is relevant in determining whether there is an obligation to make an escrow payment and whether that obligation is enforceable. 545 F.3d at 354. As in *Campbell*, the terms of the Rodriguezes' mortgage establish that the obligation to pay into the escrow account was enforceable. Thus, Countrywide had a claim for the unpaid escrow.

We recognize that the unpaid escrow amounts may not have constituted "debt" under the terms of the mortgage until Countrywide actually disbursed its own funds to cover an escrow expense for which there was a shortage. This fact, however, does not undermine our conclusion that the unpaid escrow constitutes a claim. *Grossman*'s instructs that our focus should not be on when the claim accrues (with disbursement of Countrywide's own funds), but whether a claim exists. 607 F.3d at 121. Here, Countrywide's right to successfully collect may be contingent on a disbursement by Countrywide of its own funds to satisfy an escrow item for which there is a deficiency. But the contingent nature of the right to payment does not change the fact that the right to payment exists, even if it is remote, and thereby constitutes a "claim" for purposes of § 101(5).[4]

---

[4] Following the Fifth Circuit's lead in *Campbell*, we also reject Countrywide's argument that forcing it to recoup the missed escrow cushion payments through the Chapter 13 plan improperly modifies Countrywide's rights under RESPA and "Regulation X," 24 C.F.R. § 3500.17. As the *Campbell* court held, at least implicitly, the principle of protecting the debtor from all efforts to collect pre-petition claims outside of the Chapter 13 structure takes precedence over Countrywide's other rights under RESPA to recalculate the escrow payments. *See Campbell*, 545 F.3d at 353-54; *id.* at 353 (noting that "the issue" was whether Countrywide's recalculation rights under RESPA "overrides bankruptcy principles" and finding that it does not).

## B.    Violation of the Automatic Stay

Having determined that the $1,787.69 escrow cushion should have been part of Countrywide's proof of claim, the question arises as to whether Countrywide violated the automatic stay when it sought the cushion outside of the bankruptcy proceeding.    Section 362(k)—formerly section 362(h)—of the Bankruptcy Code provides for recovery of actual damages for willful violations of the automatic stay.  11 U.S.C. § 362(k); *see also In re Lansdale Family Rest., Inc.*, 977 F.2d 826, 829 (3d Cir. 1992) (considering former § 362(h)).  Because both the Bankruptcy Court and the District Court determined that Countrywide was permitted to calculate the missed escrow payments outside of the bankruptcy proceeding, they never reached the issue of whether Countrywide willfully violated the automatic stay when it sent the Rodriguezes a demand for higher monthly escrow payments.    Whether Countrywide willfully violated the automatic stay and, if so, the extent, if any, of the Rodriguezes' damages, are matters that should be resolved in the first instance on remand.

## IV.  Conclusion

For the foregoing reasons, we will vacate the decision of the District Court and remand this matter to the District Court for further proceedings consistent with this Opinion.

*In Re: Francisco Rodriguez*, No. 09-2724

SLOVITER, *Circuit Judge*, Dissenting.

In 1974, Congress enacted the Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. §§ 2601-2617, to govern the procedures to be followed in connection with escrow accounts established to ensure the payment of real estate taxes and insurance. When there has been a default, RESPA authorizes a loan servicer to estimate the property taxes and insurance that will be due over the ensuing twelve months and to adjust the borrower's monthly escrow payments under the mortgage to cover the estimated expenses, subject to certain limitations. *See id.* § 2609(a)(1)-(2).[1] Regulation X, RESPA's implementing regulation, also allows a loan servicer to conduct the analysis at the inception of the loan, at the end of each computation year, or "at other times during the escrow computation year." 24 C.F.R. § 3500.17(f)(1)(ii). As part of this procedure, RESPA and Regulation X authorize a servicer to "require the borrower to pay additional deposits to make up the shortage or eliminate the deficiency" in an escrow account. *Id., see also* 12 U.S.C. § 2609(a)(2). A "deficiency" is "the amount of a negative balance in an escrow account." 24 C.F.R. § 3500.17(b). A "shortage" is "an amount by which a current escrow account balance falls short of the target balance at the time of escrow analysis." *Id.*

In its opinion on the Debtors' appeal, the District Court noted: "[T]he parties agree [that as of the petition date,] the Debtors' [the Rodriguezes'] escrow account was actually deficient by $3,869 – the total amount Countrywide paid for property taxes and insurance on behalf of Debtors in excess of the funds Debtors actually deposited into their escrow account." *In re Rodriguez*, No. 08-5207, slip op. at 2 (D.N.J. May 11, 2009). Consistent with the requirements of the Bankruptcy Act, Countrywide included that amount in its proof of claim, and then

---

[1] Regulation X of RESPA provides for a twelve-month forward-looking analysis to determine how much money must be deposited monthly into the escrow account. *See* 24 C.F.R. § 3500.17(b).

recalculated the remainder of the escrow precisely as provided under RESPA.

For purposes of the forward-looking calculation, Countrywide treated the Rodriguezes' escrow account as having a zero balance on the Petition Date. Because of the Rodriguezes' failure to keep the required escrow payments current, Countrywide set the Rodriguezes' post-petition escrow payment at $947.77, which reflected a monthly increase $240.57 over their pre-petition escrow payment of $707.20.[2] The higher payment as authorized by Regulation X was intended to avoid the escrow shortage that would have occurred as taxes and insurance became due over the ensuing twelve months.[3]

In discussing RESPA, the Bankruptcy Court stated:

[A] lender must estimate future property taxes and assessments, as well as insurance premiums, and allocate the estimated sum over a period sufficient to provide adequate funds to pay the escrow charges when due. This right is limited by RESPA which proscribes lenders from requiring a borrower to deposit in any escrow account an aggregate sum which exceeds the amount sufficient to pay taxes, insurance premiums and other charges with

---

[2] The Bankruptcy Court held that Countrywide had mistakenly included a pre-petition October 2007 tax bill in its post-petition escrow analysis and therefore recalculated the post-petition monthly shortage payment as $94.53, not $210.65, thereby reducing the total-post petition monthly payments to $831.65, not $947.77 as Countrywide originally calculated. Countrywide does not challenge this revision. *In re Rodriguez*, 391 B.R. 723, 731-32 (Bankr. D.N.J. 2008).

[3] Whereas the Rodriguezes' pre-petition escrow payment was based on a projected escrow surplus that assumed they were making their payments, the higher post-petition escrow payment was based on the shortage that would develop were the Rodriguezes to continue to pay the same monthly escrow that resulted in the escrow arrearage.

respect to the property during the ensuing twelve-month period, plus one-sixth of the estimated total of such amounts. 12 U.S.C. § 2609(a). This limitation, however, is subject to exception. If the lender determines that a deficiency exists, the lender may require the borrower to make additional monthly deposits into the escrow account to remedy such deficiency, but must notify the borrower of any shortage of funds. 12 U.S.C. § 2609(a)(2), (b). Upon the borrower's payment of the escrow amounts, the mortgage requires the lender to hold the funds in accordance with RESPA and to apply the funds to pay the escrow charges when due, but no later than the time specified under RESPA.

RESPA also authorizes lenders, like Countrywide, to calculate and collect certain "advance deposits in escrow accounts," or shortage contributions, in order to minimize any negative balance that may occur in a borrower's escrow account over the twelve months when Countrywide must disburse funds to protect the property (*e.g.* insurance, PMI payments, and taxes)[.]

*In re Rodriguez*, 391 B.R. 723, 727-28 (Bankr. D.N.J. 2008) (footnote omitted).

The majority fails to acknowledge that Countrywide acted in accordance with RESPA. On the other hand, the Bankruptcy Court correctly noted that:

Debtors . . . fail to explain satisfactorily why such rights afforded lenders under RESPA should be abrogated in the context of a Chapter 13 bankruptcy proceeding. Debtors' required shortage contribution is a charge authorized by and calculated in accordance with RESPA, as well as the underlying loan agreement . . . .

*Id.* at 729.

The majority never even tries to explain why RESPA is inapplicable. The Bankruptcy Court recognized the practical

3

effect of the Debtors' argument, which it rejected:

> In effect, Debtors seek to have Countrywide include in its pre-petition arrearage, to be paid over the life of the Chapter 13 plan, not only sums actually disbursed by Countrywide for items such as taxes and insurance, but also such additional sums the Debtors should have paid into the escrow account prior to filing. Moreover, Debtors contend that in projecting the twelve month summary balance of the Debtors' escrow account, Countrywide should not have started at zero, but rather should have calculated the lowest projected escrow balance as if the Debtors had made the requisite pre-petition monthly payments.

*Id.* Of course, the Debtors never made those payments, and it made little sense to credit them for payments never made. Instead, Countrywide included in its claim the escrow amounts which it paid.

The majority posits that Countrywide should have included in its claim filed in the bankruptcy the escrow amounts not yet due (an amount the majority calculates as $1,787.69), an argument rejected by the Bankruptcy Court. That Court agreed with Countrywide's contention that its pre-petition claim should be limited to the amounts actually disbursed.

The Bankruptcy Court cogently explained why Countrywide's analysis was correct and why the definition of "claim," though broad, is not without limit:

> A "right to payment", as incorporated in the statutory definition of "claim" under 11 U.S.C. § 101(5) implicitly encompasses a right of retention, which is not subsumed in Countrywide's "right to collect" escrow items. Absent sums actually expended, as permitted under the loan documents to protect its own collateral interest, Countrywide need not include pre-petition escrow arrears in its proof of claim inasmuch as the mortgage instrument only permits Countrywide to retain such funds as

4

> reimbursement to the extent of actual advances.
> Otherwise, Countrywide merely collects and holds such
> funds for payment to third parties.

*Id.* at 730.[4]

    This conclusion is consistent with the Second Circuit's interpretation of "claim" in *In re Villarie*, 648 F.2d 810, 812 (2d Cir. 1981), which, contrary to the majority's assertion, is germane. There, the court held that even though a state pension fund had the ability to deduct payments from a state employee's paycheck in order to pay back a loan, the fund had no right to sue for the amount of the loan because the employee was, in effect, borrowing from his own retirement. Accordingly, there was no enforceable claim against the debtor. *Id.* Such a conclusion is even more appropriate here because the mortgage provides no means of recovering the non-paid escrow funds. The only remedy is acceleration of payment of other sums – the sums actually secured by the mortgage. This interpretation of the meaning of a "claim" is consistent with the provisions of RESPA which authorize a lender to recalculate future escrow fund payments at a variety of junctures to ensure that shortages are covered.

> Outside of bankruptcy, mortgagors with a negative
> escrow account can and should expect to have their

---

[4] The additional $1,787.69 the majority believes Countrywide should have included in its proof of claim bears no relationship to the monthly shortage payments Countrywide sought post-petition. Indeed, as calculated by the Bankruptcy Court, the Rodriguezes' monthly post-petition shortage payments should be $94.53 a month. Over the course of a year, this amounts to approximately $1,134.30. 391 B.R. at 732. Perversely, under the majority's opinion, Countrywide is required, and indeed allowed, to claim $1,787.69 in Bankruptcy for the missed escrow payments, when it would have been entitled to increase the shortage payments by only $1,134.30 over the course of a year.

escrow account re-examined, in accordance with RESPA regulations, and be assessed an additional monthly charge for the escrow shortage. No one would suggest that non-debtors could seek to have a lender calculate an escrow shortage contribution, by giving credit for missed monthly payments. Certainly, there is no reason to afford Chapter 13 debtors with such rights, and this Court finds nothing in either RESPA or the Bankruptcy Code which mandates such a result. Accordingly, this Court regards Countrywide's approach in treating the Debtors' escrow account as having a zero balance as logical, reasonable and supported by applicable non-bankruptcy law.

391 B.R. at 731.

The majority relies on language in the Fifth Circuit opinion in *Campbell v. Countrywide Home Loans*, 545 F.3d 348 (5th Cir. 2008), which is arguably dicta. In any event, that decision is not binding on us.

More important is that the majority opinion sets up an irreconcilable conflict between two federal statutes, RESPA, 12 U.S.C. § 2609(a), and the Bankruptcy Code's automatic stay, 11 U.S.C. § 362(a). Under the majority's approach, it is difficult to foresee that any mortgage lender that seeks to recalculate escrow due in accordance with RESPA and Regulation X would not be in violation of the automatic stay. In effect the majority is abrogating RESPA. That is a serious step - one that a federal court should hesitate to do. As the Supreme Court has stated:

The courts are not at liberty to pick and choose among congressional enactments, and when two statutes are capable of co-existence, it is the duty of the courts, absent a clearly expressed congressional intention to the contrary, to regard each as effective.

*Morton v. Manchuria*, 417 U.S. 535, 551 (1974). The majority's opinion fails to follow the admonition of the Supreme Court in *Morton* as it has made no effort to accommodate its

6

interpretation of RESPA with that of the Bankruptcy and District Courts in this case.

For the reasons set forth, I respectfully dissent.